## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| DEBORAH LOCASCIO and DAVID SUMMERS, Individually and as representatives of a class of similarly situated persons, on behalf of the FLUOR CORPORATION EMPLOYEES' SAVINGS INVESTMENT PLAN,<br><br>          Plaintiffs,<br><br>   v.<br><br>FLUOR CORPORATION, THE BOARD OF DIRECTORS OF FLUOR CORPORATION, THE FLUOR CORPORATION BENEFITS ADMINISTRATIVE COMMITTEE, THE FLUOR CORPORATION RETIREMENT PLAN INVESTMENT COMMITTEE and DOES No. 1-30, Whose Names Are Currently Unknown,<br><br>          Defendants. | CASE NO.<br><br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

## I.    <u>INTRODUCTION</u>

1.    Plaintiffs, Deborah Locascio ("Locascio") and David Summers ("Summers") (collectively, "Plaintiffs"), individually in their capacity as former participants of the Fluor Corporation Employees' Savings Investment Plan ("Plan"), bring this action under 29 U.S.C. § 1132, on behalf of the Plan and a class of similarly-situated participants, against Defendants, Fluor Corporation ("Fluor"), the Board of Directors of Fluor Corporation ("Board"), the Fluor Corporation Benefits Administrative Committee ("Administrative Committee"), the Fluor Corporation Retirement Plan Investment Committee ("Investment Committee") (collectively, "Committees") and Does No. 1-30, who are members of the Committees or other fiduciaries of the Plan and whose names are currently unknown (collectively, "Defendants"), for breach of their fiduciary duties under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.*, and related breaches of applicable law beginning six years prior to the date this

action is filed and continuing to the date of judgment or such earlier date that the Court determines is appropriate and just (the "Class Period").

2.       Defined contribution plans (e.g., 401(k) and 403(b) plans) that are qualified as tax-deferred vehicles have become the primary form of retirement saving in the United States and, as a result, America's *de facto* retirement system.  Unlike traditional defined benefit retirement plans, in which the employer typically promises a calculable benefit and assumes the risk with respect to high fees or under-performance of pension plan assets used to fund defined benefits, 401(k) and 403(b) plans operate in a manner in which participants bear the risk of high fees and investment underperformance.

3.       The importance of defined contribution plans to the United States retirement system has become pronounced as employer-provided defined benefit plans have become increasingly rare as an offered and meaningful employee benefit.

4.       As of December 31, 2020, the Plan had 15,062 participants with account balances and assets totaling approximately $3.45 billion, placing it in the top 0.1% of all defined contribution plans by plan size.[1]  Defined contribution plans with substantial assets, like the Plan, have significant bargaining power and the ability to demand low-cost administrative and investment management services within the marketplace for administration of defined contribution plans and the investment of defined contribution assets.  The marketplace for defined contribution retirement plan services is well-established and can be competitive when fiduciaries of defined contribution retirement plans act in an informed and prudent fashion.

5.       Defendants maintain the Plan, and are responsible for selecting, monitoring, and retaining the service provider(s) that provide investment, recordkeeping, and other administrative services.  Defendants are fiduciaries under ERISA, and, as such, owe a series of duties to the

---

[1] The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2017 (pub. August 2020).

Plan and its participants and beneficiaries, including obligations to act for the exclusive benefit of participants, ensure that the investment options offered through the Plan are prudent and diverse, and ensure that Plan expenses are fair and reasonable.

6.      Defendants have breached their fiduciary duties to the Plan.  As detailed below, Defendants: (1) failed to fully disclose the expenses and risk of the Plan's investment options to participants; (2) allowed unreasonable expenses to be charged to participants; and (3) selected, retained, and/or otherwise ratified high-cost and poorly-performing investments, instead of offering more prudent alternative investments when such prudent investments were readily available at the time Defendants selected and retained the funds at issue and throughout the Class Period; .

7.      To remedy these fiduciary breaches and other violations of ERISA, Plaintiffs bring this class action under Sections 404, 409 and 502 of ERISA, 29 U.S.C. §§ 1104, 1109 and 1132, to recover and obtain all losses resulting from each breach of fiduciary duty.  In addition, Plaintiffs seek such other equitable or remedial relief for the Plan and the proposed class ("Class") as the Court may deem appropriate and just under all of the circumstances.

8.      Plaintiffs specifically seek the following relief on behalf of the Plan and the Class:

a.      A declaratory judgment holding that the acts of Defendants described herein violate ERISA and applicable law;

b.      A permanent injunction against Defendants prohibiting the practices described herein and affirmatively requiring them to act in the best interests of the Plan and its participants;

c.      Equitable, legal or remedial relief for all losses and/or compensatory damages;

d.      Attorneys' fees, costs and other recoverable expenses of litigation; and

e.      Such other and additional legal or equitable relief that the Court deems

appropriate and just under all of the circumstances.

## II.      THE PARTIES

9.      Locascio is a former employee of Fluor and is a former participant in the Plan

under 29 U.S.C. § 1002(7).  Locascio is a resident of Sugar Land, Texas.  During the Class

Period, Locascio maintained an investment through the Plan in the Total Bond Index Fund, the

S&P 500 Index Fund, the Small/Mid Cap Equity Index Fund, the Non-U.S. Equity Index Fund,

and the Fluor Corporation Common Stock Fund and was subject to the excessive recordkeeping

and administrative costs alleged below.

10.     Summers is a former employee of Fluor and is a former participant in the Plan

under 29 U.S.C. § 1002(7).  Summers is a resident of Rockdale, Texas.  During the Class Period,

Locascio maintained an investment through the Plan in the Fluor Target Date 2030 Fund, the

Fluor Target Date 2055 Fund, the Stable Value Fund, the Total Bond Index Fund, the Diversified

Bond Fund, the S&P 500 Index Fund, the Small/Mid Cap Equity Fund, and the Fluor

Corporation Common Stock Fund and was subject to the excessive recordkeeping and

administrative costs alleged below.

11.     Fluor is a Delaware domestic corporation headquartered in Irving, Texas.  Fluor is

a global engineering, procurement, construction and maintenance company that purports to

design, build and maintain "the world's toughest projects."

12.     The Board appointed "authorized representatives" of Fluor, including the

Committees, as plan fiduciaries.  Does No. 1-10 are members of the Board who were/are fiduciaries

of the Plan under ERISA pursuant to 29 U.S.C. §§ 1002(21)(A) because each exercised discretionary

authority to appoint and/or monitor the Committees, which had control over Plan management and/or

authority or control over management or disposition of Plan assets.

13.    The Administrative Committee is the Plan administrator and is a fiduciary under ERISA pursuant to 29 U.S.C. §§ 1002 and 1102.  The Administrative Committee exercises discretionary authority and control to administer, construe, and interpret the Plan and its assets. The Administrative Committee maintains its address at Fluor's corporate headquarters in Irving, Texas.  The Administrative Committee and its members are appointed by Fluor to administer the Plan on Fluor's behalf.

14.    The Investment Committee is established by Fluor to assist Fluor with the selection of investment funds offered for selection by Plan participants and is a fiduciary under ERISA pursuant to 29 U.S.C. §§ 1002 and 1102.  The Investment Committee exercises authority or control in selecting and monitoring the Plan's assets.  The Investment Committee maintains its address at Fluor's corporate headquarters in Irving, Texas.  The Investment Committee has "the authority to manage the assets of the Plan, including through determining the Plan's investment options, monitoring the diversity of such investment options, and providing investment direction to the Trustee."

15.    Does No. 11-30 are the members of the Committees and, by virtue of their membership, fiduciaries of the Plan.  Plaintiffs are currently unable to determine the membership of the Committees or the identity of the other fiduciaries of the Plan because, despite reasonable and diligent efforts, it appears that the membership of the Committees and the identity of any other fiduciaries are not publicly available.  As such, these defendants are named Does as placeholders.  Plaintiffs will move, pursuant to Rule 15 of the Federal Rules of Civil Procedure, to amend this Complaint to name the members of the Committees, the members of the Board, and other responsible individuals as defendants as soon as their identities are discovered.

### III.    JURISDICTION AND VENUE

16.     Plaintiffs seek relief on behalf of the Plan pursuant to ERISA's civil enforcement remedies with respect to fiduciaries and other interested parties and, specifically, under 29 U.S.C. § 1109 and 29 U.S.C. § 1132.

17.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States.

18.      Venue is proper in this District pursuant to Section 502(e) of ERISA, 29 U.S.C. § 1332(e), and 28 U.S.C. § 1391 because Fluor's principal place of business is in this District and the Plan is administered from this judicial district.  Furthermore, a substantial part of the acts and omissions giving rise to the claims asserted herein occurred in this District.

19.     Plaintiffs have standing to bring this action.  Section 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2), authorizes any participant, fiduciary or the Secretary of Labor to bring suit as a representative of a plan, with any recovery necessarily flowing to a plan.  As explained herein, the Plan has suffered millions of dollars in losses resulting from Defendants' fiduciary breaches and remains vulnerable to continuing harm, all redressable by this Court.  In addition, although standing under Section 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2), is established by these Plan-wide injuries, Plaintiffs and all Plan participants suffered financial harm as a result of the Plan's imprudent investment options and excessive recordkeeping and administrative fees, and were deprived of the opportunity to invest in prudent options with reasonable fees, among other injuries.

## IV.     FACTUAL ALLEGATIONS

### A.     Background and Plan Structure

20.     The Plan is a single-employer 401(k) plan, in which participants direct the investment of their contributions into various investment options offered by the Plan.  Each participant's account is credited with the participant contributions, employer matching contributions, any discretionary contributions, and earnings or losses thereon.  The Plan pays

Plan expenses from Plan assets, and the majority of administrative expenses are paid by participants as a reduction of investment income.  Each participant's account is charged with the amount of distributions taken and an allocation of administrative expenses.  The available investment options for participants of the Plan include custom investment funds set up as separate accounts, Fluor common stock, and a self-directed brokerage account.

21.     The Plan's investment alternatives are custom options set up as separate accounts that are managed either exclusively for the Plan or on a commingled basis for the Plan and other institutional investors.  Each custom fund operates under guidelines established between the Fluor Corporation Master Retirement Trust ("Master Trust") and the respective investment manager appointed by the Investment Committee.  The custom investment funds are not mutual funds and, accordingly, are not regulated by the Securities and Exchange Commission ("SEC").

22.     The Plan operates, in part, as an employee stock ownership plan, which enables Fluor employees to acquire an ownership interest in the company through units of Fluor Corporation Common Stock Fund.  The fund operates as a unitized fund, meaning participant accounts invest in units which represent a *pro rata* interest in the Plan's investment in Fluor stock and cash or cash equivalents, which are held in a trust fund.  Plan participants are prohibited from investing more than 20% of their account balance in the stock fund.

23.     Voya Financial ("Voya") has served as the Plan's recordkeeper since mid-2017, when the Plan's relationship with Aon Hewitt was terminated.  Aon Hewitt had served as the plan's recordkeeper from the beginning of the Class Period.  As the recordkeeper, Voya is responsible for maintaining records with respect to employees' accounts in the Plan, effectuating participant Plan investment elections, and performing administrative functions such as processing loan and withdrawal requests.

24.     During the Class Period, Plan assets were held in the Master Trust by the primary custodian of the Plan, the Northern Trust Company.  All investments and asset allocations are

performed through this trust fund, which holds the investments of the Plan and various other employee benefit plans sponsored by Fluor and certain of its subsidiaries and affiliates. The Plan's assets represent approximately 99% of the total assets in the Master Trust.

**B.**     **The Defined Contribution Industry**

25.     Failures by ERISA fiduciaries to monitor fees and costs for reasonableness, such as those identified herein, have stark financial consequences for retirees. Every extra level of expenses imposed upon plan participants compounds over time and reduces the value of participants' investments available upon retirement. Over time, even small differences in fees compound and can result in vast differences in the amount of a participant's savings available at retirement. As the Supreme Court has explained, "[e]xpenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan." *Tibble v. Edison Int'l*, 575 U.S. 523, 525 (2015).

26.     The impact of excessive fees on a plan's employees' and retirees' retirement assets is dramatic. The U.S. Department of Labor ("DOL") has noted that a 1% higher level of fees over a 35-year period makes a 28% difference in retirement assets at the end of a participant's career.[2]

27.     Plan participants typically have little appreciation of the fees being assessed to their accounts. Indeed, according to a 2017 survey conducted by TD Ameritrade, only 27% of investors believed they knew how much they were paying in fees as participants in defined contribution plans, and 37% were unaware that they paid defined contribution fees at all.[3] It is incumbent upon plan fiduciaries to act for the exclusive best interest of plan participants, protect their retirement dollars, and ensure that fees are and remain reasonable for the services provided, and are properly

---

[2] *A Look at 401(k) Plan Fees*, UNITED STATES DEPT. OF LABOR at 1-2 (Sept. 2019), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resourcecenter/publications/a-look-at-401k-plan-fees.pdf (last visited December 5, 2021).

[3] *See* https://s2.q4cdn.com/437609071/files/doc_news/research/2018/Investor-Sentiment-Infographic-401k-fees.pdf (last visited December 5, 2021).

and fully disclosed. Unfortunately, fiduciaries of defined contribution retirement plans, including large retirement plans like the Plan, also often lack understanding of the fees being charged to the plans that they administer, manage and control in derogation of their fiduciary duties.

**C.**     **Recordkeeping and Administrative Services**

28.     Fiduciaries of virtually all large defined contribution plans, including the Plan, hire a single provider to provide the essential recordkeeping and administrative ("RK&A") services for the plan.   These services include, but are not limited to, maintaining plan records, tracking participant account balances and investment elections, providing transaction processing, providing call center support and investment education and guidance, providing participant communications, and providing trust and custodial services.

29.     The term "recordkeeping" is a catchall term for the entire suite of recordkeeping and administrative services typically provided by a plan's service provider or "recordkeeper" – that is recordkeeping fees and RK&A fees are one and the same and the terms are used synonymously.

30.     Recordkeepers typically collect their fees in two forms, respectively referred to as "direct" compensation and "indirect" compensation.

31.     Direct compensation is paid directly from plan assets and reflected as a deduction in the value of participant accounts.

32.     Indirect Compensation is paid to the recordkeeper indirectly by third parties and is not transparent to retirement plan participants.   In other words, the fees are taken from the investment options prior to the value of the investment option being provided to the participant (most often from the investment's expense ratio in the form of so-called "revenue sharing" payments that are collected by the investment provider and then remitted or kicked-back to the recordkeeper).   Thus, in most cases, participants are not aware that they are paying these fees.

Most indirect compensation is typically collected by recordkeepers through asset-based "revenue sharing," as explained above.

33.    Virtually all recordkeepers are subsidiaries or affiliates of financial services and insurance companies that also provide investment options to defined contribution plans, (*e.g.*, mutual funds, insurance products, collective trusts, separate accounts, *etc.*), or have some other ancillary line of business (*e.g.*, consulting) to sell to plans.  As a result, all recordkeepers consider the economic benefit of their entire relationship with a defined contribution plan when setting fees for the RK&A services.  Simply put, discounts in the RK&A fee rate are often available based on revenues the recordkeeper earns through the provision of other services (*e.g.*, investment management revenues).  In many cases, the additional investment management revenues are more than double or triple the revenue earned by the recordkeeper for providing RK&A services.

34.    There are two types of essential recordkeeping services provided by all national recordkeepers for large plans with substantial bargaining power (like the Plan).  First, an overall suite of recordkeeping services is provided to large plans as part of a "bundled" arrangement for a buffet style level of service (meaning that the services are provided, in retirement industry parlance, on an "all-you-can-eat" basis), including, but not limited to, the following services:

     i.    Recordkeeping;

     ii.    Transaction processing (which includes the technology to process purchases and sales of participants' assets, as well as providing the participants access to investment options selected by the plan sponsor);

     iii.    Administrative services related to converting a plan from one recordkeeper to another;

     iv.    Participant communications (including employee meetings, call centers/phone support, voice response systems, web account access, and the

preparation of other materials distributed to participants, *e.g.*, summary plan descriptions);

v. Maintenance of an employer stock fund (if needed);

vi. Plan document services, which include updates to standard plan documents to ensure compliance with new regulatory and legal requirements;

vii. Plan consulting services, including assistance in selecting the investment lineup offered to participants;

viii. Accounting and audit services, including the preparation of annual reports, *e.g.*, Form 5500s[4] (excluding the separate fee charged by an independent third-party auditor);

ix. Compliance support, including assistance interpreting plan provisions and ensuring the operation of the plan is in compliance with legal requirements and the provisions of the plan (excluding separate legal services provided by a third-party law firm); and

x. Compliance testing to ensure the plan complies with U.S. Internal Revenue Service nondiscrimination rules.

35.     This suite of essential RK&A services can be referred to as "Bundled RK&A" services.  These services are offered by all recordkeepers for one price (typically at a per capita price), regardless of the services chosen or utilized by the plan.  Anyone who has passing familiarity with recordkeepers' responses to requests for proposals, their bids and their contracts understands and appreciates that the services chosen by a large plan do not affect the amount charged by recordkeepers for such basic and fungible services and any claim by Defendants that recordkeeping expenses depend upon the service level provided to a plan with respect to the above

---

[4]The Form 5500 is the annual report that defined contribution plans are required to file with the DOL and U.S. Department of Treasury pursuant to the reporting requirements of ERISA.

services is both false and frivolous.  Nonetheless, as is all too often the case, when attempting to defend their malfeasance or nonfeasance with respect to recordkeeping fees, fiduciary-defendants often disingenuously assert that the cost of Bundled RK&A services depend upon service level (even though such an assertion is plainly untrue based upon the actual marketplace for such services), as part of attempt to perpetuate misunderstanding by the less informed in order to stave off breach of fiduciary duty claims.

36.   The second type of essential RK&A services, hereafter referred to as "A La Carte RK&A" services, provided by all national recordkeepers, often has separate, additional fees based on the conduct of individual participants and the usage of the services by individual participants. These fees are distinct from the Bundled RK&A arrangement to ensure that one participant is not forced to help another cover the cost of, for example, taking a loan from their plan account balance. These A La Carte RK&A services typically include, but are not limited to, the following:

    i.   Loan processing;

    ii.   Brokerage services/account maintenance (if offered by the plan);

    iii.   Distribution services; and

    iv.   Processing of qualified domestic relations orders.

37.   All national recordkeepers have the capability to provide all of the aforementioned RK&A services to all large defined contribution plans, including those much smaller than the Plan.

38.   For large plans with greater than 5,000 participants, any minor variations in the way that these essential RK&A services are delivered have no material impact on the fees charged by recordkeepers to deliver the services. This fact is confirmed by the practice of all recordkeepers of quoting fees for the Bundled RK&A services on a per-participant basis without regard for any individual differences in services requested—which are treated by recordkeepers as immaterial because they are, in fact, inconsequential to recordkeepers from a cost perspective.

39.     While recordkeepers in the defined contribution industry attempt to distinguish themselves through marketing and other means, they all actually offer the same bundles and combinations of services as their competitors. Accordingly, the market for defined contribution plan RK&A services has become increasingly price competitive, particularly for larger plans that, like the Plan, have a considerable number of participants and significant assets.

40.     The marginal cost of adding an additional participant to a recordkeeping platform is relatively low.  These economies of scale are inherent in all recordkeeping arrangements for defined contribution plans, including the Plan.  As a plan's participant count increases, the recordkeeper's fixed costs of providing RK&A services are spread over a larger population, thereby reducing the average unit cost of delivering services on a per-participant basis.

41.     Due to these economies of scale that are part of a recordkeeping relationship, and because the incremental variable costs for providing RK&A are dependent on the number of participants with account balances in a defined contribution plan, the cost to the recordkeeper on a per-participant basis declines as the number of plan participants increases and, as a result, a recordkeeper is willing to accept a lower fee to provide RK&A as the number of participants in the plan increases.

42.     As a result, it is axiomatic in the retirement plan services industry that (1) a plan with more participants can and will receive a lower effective per-participant fee when evaluated on a per-participant basis; and (2) that as participant counts increase, the effective per-participant RK&A fee should decrease.

43.     The average cost to a recordkeeper of providing services to a participant similarly does not hinge on that participant's account balance.  In other words, it costs a recordkeeper the same amount to provide services to a participant with an account balance of $10,000 as it does to provide services to a participant with a balance of $1,000,000.

44.    Informed, prudent plan fiduciaries are aware of these cost structure dynamics. Understanding these marketplace realities and facts, prudent fiduciaries of large plans (like the Plan) will leverage the plan's participant count to obtain lower effective per-participant fees.

45.    Because recordkeeping fees are actually paid in dollars, prudent fiduciaries evaluate the fees for RK&A services on a dollar-per-participant basis.  This is the current standard of care for ERISA fiduciaries and has been throughout the Class Period.

46.    Prudent fiduciaries will regularly ensure that a plan is paying fees commensurate with its size in the marketplace by soliciting competitive bids from recordkeepers other than the plan's current provider.  Recognizing that RK&A services are essentially uniform in nature, and that any minor differences in the services required by a large plan are immaterial to the cost of providing such services, most recordkeepers only require a plan's participant count and asset level in order to provide a fee quote.  These quotes are typically provided on a per-participant basis, enabling fiduciaries to easily compare quotes on an apples-to-apples basis to determine if the current level of fees being charged by a plan's recordkeeper is reasonable.

47.    Once a prudent fiduciary has received quotes, if necessary, the fiduciary can then negotiate with the plan's current provider for a lower fee or move to a new provider to provide the same (or better) services for a competitive (or lower) reasonable fee.  This is because prudent fiduciaries understand that excessive fees significantly and detrimentally impact the value of participants' retirement accounts.

48.    After negotiating the fee to be paid to the recordkeeper and electing to have the plan (*i.e.*, participants) pay that fee, the fiduciaries can allocate the negotiated fees among participant accounts at the negotiated per-participant rate or *pro rata* based on participant account balances, among other less common ways.

**D.    Defendants' Breaches of Fiduciary Duties**

49.     As discussed in detail below, Defendants have severely breached their fiduciary duties of prudence and/or loyalty to the Plan in several significant ways.  Plaintiffs did not acquire actual knowledge regarding Defendants' breaches at issue here until shortly before this Complaint was filed.

### 1.     The Plan's Excessive Recordkeeping and Administrative Costs

50.     An obvious indicator of Defendants' breach of their fiduciary duties is the Plan's excessive RK&A costs.  The impact of such high fees on participant balances is aggravated by the effects of compounding, to the significant detriment of participants over time.  This effect is illustrated by the below chart, published by the SEC, showing the 20-year impact on a balance of $100,000 by fees of 25 basis points (0.25%), 50 basis points (0.50%), and 100 basis points (1.00%).



51.     During the Class Period, participants paid Aon Hewitt, and then, starting in 2017, Voya, for RK&A services through direct charges to their accounts and indirectly through asset-based revenue sharing.  The RK&A services provided to the Plan are and were the same standard services identified above, and those provided to comparable plans.  There are no services provided to the Plan and its participants by Aon Hewitt or Voya that are unusual or out of the ordinary.  For

large plans like the Plan any differences in services are immaterial to pricing considerations, the primary drivers of which are the number of participants and whether the plan fiduciaries employed a competitive process of soliciting bids to determine the reasonable market rate for the services required by the plan.

52.     Since the start of the Class Period, Defendants allowed the Plan to be charged total amounts of RK&A fees that far exceeded the reasonable market rate.  The table below sets forth the annual amounts per participant the Plan ultimately paid to Aon Hewitt and then Voya[5] in RK&A fees, per the Plan's Form 5500s.

| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | Average |
|---|---|---|---|---|---|---|---|
| Participant Accounts with a Balance | 18,625 | 20,345 | 18,417 | 17,145 | 16,558 | 15,062 | 17,692 |
| Direct Compensation | $1,428,922 | $1,483,884 | $1,412,495 | $1,706,000 | $2,041,000 | $ 2,118,000 | $1,698,384 |
| Total RK&A Fee ($/pp) | $77 | $73 | $77 | $100 | $123 | $141 | $96 |

53.     Given the Plan's size and resulting negotiating power, with prudent management and administration, the Plan should unquestionably have been able to obtain reasonable rates for RK&A services that were significantly lower than the effective per-participant RK&A rates set forth above.

54.     According to publicly available data and information from the Form 5500 filings of similarly sized defined contribution plans during the Class Period, other comparable plans were paying much lower fees than the Plan throughout the Class Period.  That is clear and compelling evidence that the reasonable market rate is lower than what the Plan was paying since these comparable plans were able to negotiate lower fees for materially identical services.

55.     The table below lists the RK&A fees paid by similarly sized defined contribution plans, which represent the prices available to the Plan during the Class Period.  Some of these plans used Fidelity as their recordkeeper, while others used different high-quality, national recordkeepers.  The table also indicates the number of participants and assets of each plan.

---

[5] The total RK&A fee in 2017 represents the sum of the RK&A fees paid to Aon Hewitt and Voya, respectively.

| Plan | Participants | RK&A Fee ($) | RK&A Fee ($/pp) | Recordkeeper |
|---|---|---|---|---|
| Southern California Permanente Medical Group Tax Savings Retirement Plan | 11,388 | $ 473,410 | $42 | Vanguard |
| PG&E Corporation Retirement Savings Plan | 12,273 | $ 350,111 | $29 | Fidelity |
| Viacom 401(k) Plan | 12,884 | $ 411,959 | $32 | Great West |
| Michelin 401(k) Savings Plan | 15,880 | $ 543,332 | $34 | Vanguard |
| **Fluor Corporation Employees' Savings Investment Plan Average Fee** | **17,692** | **$ 1,698,384** | **$96** | **Aon Hewitt/ Voya** |
| Ecolab Savings Plan and ESOP | 17,886 | $ 608,061 | $34 | Fidelity |
| Fedex Office and Print Services, Inc. 401(k) Retirement Savings Plan | 19,354 | $ 444,784 | $23 | Vanguard |
| Qualcomm Incorporated Employee Savings and Retirement Plan | 20,955 | $ 639,143 | $31 | Fidelity |
| The Rite Aid 401(k) Plan | 24,309 | $ 719,730 | $30 | Great West |

56.     The RK&A fees calculated[6] for each similar comparable plan in the table above include all the direct compensation paid to the recordkeeper disclosed on each plan's Form 5500, as well as all indirect compensation.  Specifically, if the plan's pricing structure as described in each plan's Form 5500 reveals that some or all of the revenue sharing is not returned to the plan, then the appropriate amount of revenue sharing is also included to calculate the RK&A fees.  In some cases, the plan's investment options do not contain revenue sharing and, as a result, any indirect revenue is immaterial to the RK&A fees.  In other plans, all of the revenue sharing is returned to the plans and is therefore not included in the fee calculation.

57.     The comparable plans above received at least the same RK&A services received by the Plan for the fees paid.  In other words, the fees in the table above are apples-to-apples comparisons in that they include all the fees being charged by each recordkeeper to provide the same RK&A services to similar defined contribution plans.

58.     As the table above indicates, the fees paid by the Plan for virtually the same package of services are much higher than those of plans with comparable, and in many cases smaller, participant counts.  Indeed, based on fees paid by other large plans during the Class Period

---

[6] Fee calculations for the comparable plans are based on the information disclosed in each plan's 2020 Form 5500, or the most recently filed Form 5500 if 2020 is not available.

receiving materially identical RK&A services, it is clear and more than reasonable to infer that Defendants failed to follow a prudent process to ensure that the Plan was paying only reasonable fees.  In light of the amounts remitted to Fidelity throughout the Class Period, Defendants clearly engaged in virtually no examination, comparison, or benchmarking of the RK&A fees of the Plan to those of other similarly sized defined contribution plans, or were complicit in paying grossly excessive fees.

59.     Defendants' failure to recognize that the Plan and its participants were grossly overcharged for RK&A services and their failure to take effective remedial actions amounts to a shocking breach of their fiduciary duties to the Plan.  To the extent Defendants had a process in place, it was imprudent and ineffective given the objectively unreasonable level of fees the Plan paid for RK&A services.  Had Defendants appropriately monitored the compensation paid to Fidelity and ensured that participants were only charged reasonable RK&A fees, Plan participants would not have lost millions of dollars in their retirement savings over the last six-plus years.

### 2.     The Plan's Objectively Imprudent Investment Options

60.     Several of the Plan's custom investment options are objectively imprudent, separate and apart from the apparent excesses with respect to the Plan's recordkeeping and administrative fees, as well as its relationship with Voya, which the Plan entered into at Defendants' behest.

#### i.     The Custom Target Date Funds

61.     Among other investments, the Plan lineup offers a suite of nine[7] custom target date funds ("Fluor TDFs").  The Fluor TDFs are custom investment alternatives established for

---

[7] The Plan offered a tenth target date fund, the 2020 vintage, for the majority of the class period.  On November 18, 2019, the 2020 Fund was reorganized into the Retirement Fund, and shareholders of the 2020 Fund received shares of the Retirement Fund.

exclusive use by the plans in the Master Trust, including the Plan.  The Fluor TDFs are managed by BlackRock, Inc. ("BlackRock"), and mirror the BlackRock LifePath Index Funds ("BlackRock TDFs"), a collective trust target date fund suite.

62.     A target date fund ("TDF") is an investment vehicle that offers an all-in-one retirement solution through a portfolio of underlying funds that gradually shifts to become more conservative as the assumed target retirement year approaches.  TDFs offer investors dynamic, easy asset allocation, while providing both long-term growth and capital preservation. Defendants were responsible for crafting the Plan lineup and could have chosen any TDF family but elected to retain the Fluor TDFs instead, an imprudent decision that has cost Plan participants significant growth in their retirement assets.  The Fluor TDFs are significantly worse performing than many of the mutual fund alternatives offered by TDF providers.  Any objective evaluation of the Fluor TDFs would have resulted in an examination of and selection of a more consistent and better performing and more appropriate TDF suite than the Fluor TDFs.  Given the relative superiority of alternative TDF suites, in creating and retaining the Fluor TDFs, Defendants clearly failed to carry out their responsibilities in a single-minded manner with an eye focused solely on the interests of the participants.  Had Defendants acted in the sole interest of Plan participants by, for example, simply weighing the benefits of the Fluor TDFs against readily available alternative TDFs, Defendants would have concluded that the Fluor TDFs represented a clearly inferior option and were therefore an inappropriate offering in the Plan lineup.

63.     Exacerbating Defendants' imprudent choice to add and retain the Fluor TDFs is the suite's role as the Plan's Qualified Default Investment Alternative ("QDIA") for as long as it has been an option in the Plan investment menu.  A retirement plan can designate one of the investment offerings from its lineup as a QDIA to aid participants who lack the knowledge or confidence to make investment elections for their retirement assets; if participants do not direct where their assets should be invested, all contributions are automatically invested in the QDIA.

Plan fiduciaries are responsible for the prudent selection and monitoring of an appropriate QDIA. The Fluor TDF with the target year that is closest to a participant's assumed retirement age (age 65) has served as the QDIA in the Plan throughout the pertinent period.

64.    Given the vast majority of plan participants in general, of which the Plan participants are no exception, are not sophisticated investors, they largely, by default, concentrate their retirement assets in TDFs.  As such, the impact of Defendants' imprudent selection of TDFs is magnified vis-à-vis other asset categories.  Indeed, throughout the Class Period, approximately 31%-34% of the Plan's assets were invested in the Fluor TDFs.

65.    Measured against appropriate, available alternative TDF suites, the Fluor TDFs are a vastly inferior retirement solution.  Throughout the Class Period, there were many TDF offerings that consistently and dramatically outperformed the Fluor TDFs, providing investors with substantially more capital appreciation.  It is apparent, given the continued presence of the Fluor TDFs in the Plan's investment menu, that Defendants failed to scrutinize the performance of the Fluor TDFs against any of the more appropriate alternatives in the TDF marketplace. Accordingly, the Plan's investment in the Fluor TDFs has resulted in participants missing out on millions of dollars in retirement savings growth that could have been achieved through an investment in any of the below proposed alternative TDFs, and indeed many other options.

66.    A prudent fiduciary evaluates TDF returns not only against an appropriate index or a group of peer TDFs, but also against specific, readily investable alternatives to ensure that participants are benefitting from the current TDF offering.  By the specific data points available to Plaintiff through Plan literature, the returns of the Fluor TDFs have been dwarfed across the board by those of a representative group of TDFs available off-the-shelf[8] ("Off-the-Shelf

---

[8]The Off-the-Shelf TDFs consist of the American Funds Target Date Funds Class R6 ("American TDFs"), the Fidelity Freedom Index Funds Investor Class ("Fidelity TDFs"), the State Street Target Retirement Funds Class K ("State Street TDFs"), the T. Rowe Price Retirement Funds ("T. Rowe Price TDFs"), and the TIAA-CREF Lifecycle Index Funds Institutional Class ("TIAA-CREF TDFs").

TDFs").  The below performance data, comparing the three- and five-year[9] annualized returns of several representative vintages of the Fluor TDFs to those of the same iterations of the Off-the-Shelf TDFs, represents information easily accessible to Defendants during the Class Period. Defendants could have sought this comparative returns data at any time from Watson Wyatt Investment Consulting ("Watson Wyatt"), the Plan's investment advisor, or Aon Hewitt/Voya, or indeed obtained it themselves in real time through just a few clicks of a computer mouse.

| Returns as of 4Q2018 | | | Returns as of 4Q2018 | | | Returns as of 4Q2018 | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 2025 Fund | 3-Year | 5-Year | 2040 Fund | 3-Year | 5-Year | 2055 Fund | 3-Year | 5-Year |
| American TDFs | 6.12% | 5.00% | American TDFs | 7.62% | 6.05% | American TDFs | 7.81% | 6.17% |
| Fidelity TDFs | 5.72% | 4.46% | Fidelity TDFs | 6.97% | 5.14% | Fidelity TDFs | 6.98% | 5.13% |
| State Street TDFs | 6.00% | | State Street TDFs | 6.73% | | State Street TDFs | 6.93% | |
| T. Rowe Price TDFs | 6.10% | 4.77% | T. Rowe Price TDFs | 6.77% | 5.30% | T. Rowe Price TDFs | 6.78% | 5.31% |
| TIAA-CREF TDFs | 5.76% | 4.70% | TIAA-CREF TDFs | 7.11% | 5.45% | TIAA-CREF TDFs | 7.44% | 5.64% |
| Fluor TDFs | 5.10% | 3.80% | Fluor TDFs | 6.30% | 4.60% | Fluor TDFs | 6.50% | 4.70% |
| Fluor Rank | Last | Last | Fluor Rank | Last | Last | Fluor Rank | Last | Last |

| Returns as of 4Q2019 | | | Returns as of 4Q2019 | | | Returns as of 4Q2019 | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 2025 Fund | 3-Year | 5-Year | 2040 Fund | 3-Year | 5-Year | 2055 Fund | 3-Year | 5-Year |
| American TDFs | 9.47% | 7.12% | American TDFs | 12.76% | 9.30% | American TDFs | 13.11% | 9.54% |
| Fidelity TDFs | 9.58% | 6.97% | Fidelity TDFs | 12.15% | 8.73% | Fidelity TDFs | 12.13% | 8.71% |
| State Street TDFs | 9.97% | 7.13% | State Street TDFs | 11.64% | 8.19% | State Street TDFs | 12.04% | 8.38% |
| T. Rowe Price TDFs | 10.34% | 7.60% | T. Rowe Price TDFs | 12.14% | 8.74% | T. Rowe Price TDFs | 12.32% | 8.86% |
| TIAA-CREF TDFs | 9.66% | 7.13% | TIAA-CREF TDFs | 11.96% | 8.73% | TIAA-CREF TDFs | 12.62% | 9.24% |
| Fluor TDFs | 8.60% | 6.20% | Fluor TDFs | 11.30% | 8.00% | Fluor TDFs | 12.00% | 8.40% |
| Fluor Rank | Last | Last | Fluor Rank | Last | Last | Fluor Rank | Last | 5/6 |

| Returns as of 2Q2020 | | | Returns as of 2Q2020 | | | Returns as of 2Q2020 | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 2025 Fund | 3-Year | 5-Year | 2040 Fund | 3-Year | 5-Year | 2055 Fund | 3-Year | 5-Year |
| American TDFs | 7.04% | 6.89% | American TDFs | 8.38% | 8.24% | American TDFs | 8.62% | 8.47% |
| Fidelity TDFs | 6.82% | 6.42% | Fidelity TDFs | 7.09% | 7.20% | Fidelity TDFs | 7.09% | 7.20% |
| State Street TDFs | 6.97% | 6.70% | State Street TDFs | 7.58% | 7.39% | State Street TDFs | 7.40% | 7.38% |
| T. Rowe Price TDFs | 6.21% | 6.48% | T. Rowe Price TDFs | 6.63% | 7.08% | T. Rowe Price TDFs | 6.54% | 7.08% |
| TIAA-CREF TDFs | 6.81% | 6.59% | TIAA-CREF TDFs | 7.32% | 7.41% | TIAA-CREF TDFs | 7.30% | 7.64% |
| Fluor TDFs | 6.00% | 5.70% | Fluor TDFs | 6.10% | 6.30% | Fluor TDFs | 6.00% | 6.40% |
| Fluor Rank | Last | Last | Fluor Rank | Last | Last | Fluor Rank | Last | Last |

67.    The dramatic underperformance of the Fluor TDFs compared to its peers among the Off-the-Shelf TDFs is not limited to the above few points during the Class Period for which

---

[9] Investment professionals and investment policy statements for virtually all competently managed defined contribution retirement plans appropriately recognize that the three-year and five-year annualized returns are the most important metrics for evaluating whether investment options should be maintained in a retirement plan lineup.

Plaintiff has Fluor TDF performance data from participant disclosures.[10]  Indeed, the

performance of the Fluor TDFs persistently and dramatically trailed the performance of the Off-

the-Shelf TDFs at *every quarter end* in the Class Period.[11]  At any point in the Class Period, such

data would have been sufficient to convince a fiduciary following a prudent process that the

Fluor TDFs should be removed:

- At the end of the First Quarter of 2016 (the first quarter of the Class Period), the Black Rock 2040 TDF's three-year return of 5.15% trailed those of the Off-the-Shelf TDFs, which ranged from 5.80% to 8.44%.  Similarly, the BlackRock 2040 TDF's five-year return of 5.30% trailed those of the Off-the-Shelf TDFs, which ranged from 5.76% to 8.41%.

- At the end of the Second Quarter of 2016, the Black Rock 2040 TDF's three-year return of 6.19% trailed those of the Off-the-Shelf TDFs, which ranged from 6.73% to 8.61%.  Similarly, the BlackRock 2040 TDF's five-year return of 6.11% trailed those of the Off-the-Shelf TDFs, which ranged from 6.22% to 8.73%.

- At the end of the Third Quarter of 2016, the Black Rock 2040 TDF's three-year return of 5.72% trailed those of the Off-the-Shelf TDFs, which ranged from 6.36% to 7.70%.  Similarly, the BlackRock 2040 TDF's five-year return of 9.02% trailed those of the Off-the-Shelf TDFs, which ranged from 10.22% to 13.07%.

- At the end of the Fourth Quarter of 2016, the Black Rock 2040 TDF's three-year return of 4.14% trailed those of the Off-the-Shelf TDFs, which ranged from 4.61% to 5.19%.  Similarly, the BlackRock 2040 TDF's five-year return of 8.18% trailed those of the Off-the-Shelf TDFs, which ranged from 9.00% to 11.46%.

- At the end of the First Quarter of 2017, the Black Rock 2040 TDF's three-year return of 5.24% trailed those of the Off-the-Shelf TDFs, which ranged from 6.17% to 6.84%.  Similarly, the BlackRock 2040 TDF's five-year return of 7.18% trailed those of the Off-the-Shelf TDFs, which ranged from 8.32% to 10.59%.

---

[10]The returns and composition of the Fluor TDFs closely track those of the BlackRock TDFs. The trailing returns of the two suites never differ by more than 5 basis points (0.05%), a small discrepancy that cannot compensate for the dramatic gap between the performance of the Fluor TDFs and the Off-the-Shelf TDFs.  Indeed, participant disclosures and fund fact sheets available to Plaintiff refer to the Fluor TDFs as BlackRock Life Path Index Funds. Accordingly, Plaintiff here cites to the performance data of the BlackRock TDFs as a proxy for the corresponding Fluor TDF data to which he does not have access.

[11]Investment professionals and prudent fiduciaries recognize the necessity of regularly evaluating the performance of investments on at least a quarterly basis.

- At the end of the Second Quarter of 2017, the Black Rock 2040 TDF's three-year return of 4.93% trailed those of the Off-the-Shelf TDFs, which ranged from 5.81% to 6.69%.  Similarly, the BlackRock 2040 TDF's five-year return of 8.84% trailed those of the Off-the-Shelf TDFs, which ranged from 9.81% to 12.07%.

- At the end of the Third Quarter of 2017, the Black Rock 2040 TDF's three-year return of 7.15% trailed those of the Off-the-Shelf TDFs, which ranged from 7.74% to 8.85%.  Similarly, the BlackRock 2040 TDF's five-year return of 8.71% trailed those of the Off-the-Shelf TDFs, which ranged from 9.53% to 11.90%.

- At the end of the Fourth Quarter of 2017, the Black Rock 2040 TDF's three-year return of 8.34% trailed those of the Off-the-Shelf TDFs, which ranged from 8.75% to 9.89%.  Similarly, the BlackRock 2040 TDF's five-year return of 9.09% trailed those of the Off-the-Shelf TDFs, which ranged from 10.44% to 12.45%.

- At the end of the First Quarter of 2018, the Black Rock 2040 TDF's three-year return of 7.05% trailed those of the Off-the-Shelf TDFs, which ranged from 7.46% to 9.20%.  Similarly, the BlackRock 2040 TDF's five-year return of 8.01% trailed those of the Off-the-Shelf TDFs, which ranged from 9.00% to 10.51%.

- At the end of the Second Quarter of 2018, the Black Rock 2040 TDF's three-year return of 7.70% trailed those of the Off-the-Shelf TDFs, which ranged from 8.12% to 9.56%.  Similarly, the BlackRock 2040 TDF's five-year return of 8.48% trailed those of the Off-the-Shelf TDFs, which ranged from 9.47% to 10.91%.

- At the end of the Third Quarter of 2018, the Black Rock 2040 TDF's three-year return of 11.77% trailed those of the Off-the-Shelf TDFs, which ranged from 12.25% to 13.45%.  Similarly, the BlackRock 2040 TDF's five-year return of 8.02% trailed those of the Off-the-Shelf TDFs, which ranged from 9.22% to 10.08%.

- At the end of the Fourth Quarter of 2018, the Black Rock 2040 TDF's three-year return of 6.35% trailed those of the Off-the-Shelf TDFs, which ranged from 6.73% to 7.62%.  Similarly, the BlackRock 2040 TDF's five-year return of 4.54% trailed those of the Off-the-Shelf TDFs, which ranged from 5.14% to 6.05%.

- At the end of the First Quarter of 2019, the Black Rock 2040 TDF's three-year return of 9.73% trailed those of the Off-the-Shelf TDFs, which ranged from 10.14% to 11.28%.  Similarly, the BlackRock 2040 TDF's five-year return of 6.41% trailed those of the Off-the-Shelf TDFs, which ranged from 7.19% to 7.98%.

- At the end of the Second Quarter of 2019, the Black Rock 2040 TDF's three-year return of 10.09% trailed those of the Off-the-Shelf TDFs, which ranged from 10.68% to 11.69%.  Similarly, the BlackRock 2040 TDF's five-year return of 6.18% trailed those of the Off-the-Shelf TDFs, which ranged from 7.03% to 7.74%.

- At the end of the Third Quarter of 2019, the Black Rock 2040 TDF's three-year return of 8.82% trailed those of the Off-the-Shelf TDFs, which ranged from 9.30% to 9.93%.  Similarly, the BlackRock 2040 TDF's five-year return of 6.75% trailed those of the Off-the-Shelf TDFs, which ranged from 7.21% to 7.95%.

- At the end of the Fourth Quarter of 2019, the Black Rock 2040 TDF's three-year return of 11.29% trailed those of the Off-the-Shelf TDFs, which ranged from 11.64% to 12.76%.  Similarly, the BlackRock 2040 TDF's five-year return of 8.00% trailed those of the Off-the-Shelf TDFs, which ranged from 8.19% to 9.30%.

- At the end of the First Quarter of 2020, the Black Rock 2040 TDF's three-year return of 1.71% trailed those of the Off-the-Shelf TDFs, which ranged from 2.03% to 3.77%.  Similarly, the BlackRock 2040 TDF's five-year return of 2.88% trailed those of the Off-the-Shelf TDFs, which ranged from 3.42% to 4.81%.

- At the end of the Second Quarter of 2020, the Black Rock 2040 TDF's three-year return of 6.02% trailed those of the Off-the-Shelf TDFs, which ranged from 6.63% to 8.38%.  Similarly, the BlackRock 2040 TDF's five-year return of 6.26% trailed those of the Off-the-Shelf TDFs, which ranged from 7.08% to 8.24%.

- At the end of the Third Quarter of 2020, the Black Rock 2040 TDF's three-year return of 6.96% trailed those of the Off-the-Shelf TDFs, which ranged from 7.52% to 9.05%.  Similarly, the BlackRock 2040 TDF's five-year return of 9.44% trailed those of the Off-the-Shelf TDFs, which ranged from 10.42% to 11.34%.

- At the end of the Fourth Quarter of 2020, the Black Rock 2040 TDF's three-year return of 9.64% trailed those of the Off-the-Shelf TDFs, which ranged from 10.68% to 11.76%.  Similarly, the BlackRock 2040 TDF's five-year return of 11.34% trailed those of the Off-the-Shelf TDFs, which ranged from 12.21% to 12.99%.

- At the end of the First Quarter of 2021, the Black Rock 2040 TDF's three-year return of 11.52% trailed those of the Off-the-Shelf TDFs, which ranged from 12.24% to 13.07%.  Similarly, the BlackRock 2040 TDF's five-year return of

11.88% trailed those of the Off-the-Shelf TDFs, which ranged from 12.78% to
13.75%.

- At the end of the Second Quarter of 2021, the Black Rock 2040 TDF's three-year
  return of 13.35% trailed those of the Off-the-Shelf TDFs, which ranged from
  13.99% to 14.80%.  Similarly, the BlackRock 2040 TDF's five-year return of
  12.82% trailed those of the Off-the-Shelf TDFs, which ranged from 13.66% to
  14.69%.

- At the end of the Third Quarter of 2021, the Black Rock 2040 TDF's three-year
  return of 11.87% trailed those of the Off-the-Shelf TDFs, which ranged from
  12.04% to 13.49%.  Similarly, the BlackRock 2040 TDF's five-year return of
  11.75% trailed those of the Off-the-Shelf TDFs, which ranged from 12.37% to
  13.52%.

- At the end of the Fourth Quarter of 2021, the Black Rock 2040 TDF's three-year
  return of 18.16% trailed those of the Off-the-Shelf TDFs, which ranged from
  18.48% to 19.96%.  Similarly, the BlackRock 2040 TDF's five-year return of
  12.77% trailed those of the Off-the-Shelf TDFs, which ranged from 13.34% to
  14.75%.

68.     Again, Defendants had immediate access to historical and then-current returns
data for the Fluor TDFs, and could have sought comparative data at any time from Watson Wyatt
or Aon Hewitt/Voya, or indeed obtained it themselves in real time through just a few clicks of a
computer mouse.

69.     Across the board, at all stages along the Fluor TDFs' glide path[12] from aggressive
to conservative, the Fluor TDFs' returns pale in comparison to those of the Off-the-Shelf TDFs.
Defendants, however, neglected to undertake any analysis of the Active suite against appropriate
peers using the above important performance metrics.  If Defendants had taken their fiduciary
duties seriously throughout the Class Period they would have replaced the Fluor TDFs with one
of the Off-the-Shelf TDFs, or indeed one of the several other superior, available alternative TDF

---

[12]A TDF's shifting allocations to stocks, bonds and cash over time as investors approach their target retirement date
is referred to as its glide path.

suites.  Their failure to due so caused Plan participants to miss out on millions in capital appreciation for their retirement savings.

ii.    The Custom Large Cap Equity Fund

70.    It is a basic principle of investment theory that the risks associated with an investment must first be justified by its potential returns for that investment to be rational.  This principle applies even before considering the purpose of the investment and the needs of the investor, such as the retirement assets here.  The Capital Asset Pricing Model ("CAPM"), which is used for pricing securities and generating expected returns for assets given the risk of those assets and the cost of capital, provides a mathematical formula distilling this principle:

$$ER_i = R_f + \beta_i(ER_m - R_f), \text{ where:}$$

$ER_i$=expected return of investment
$R_f$=risk-free rate
$\beta_i$=beta of the investment
$(ER_m - R_f)$=market risk premium

71.    Applied here and put simply, the $\beta_i$ is the risk associated with an actively-managed mutual fund, which can only be justified if the $ER_i$ of the investment option is, at the very least, above that of its benchmark, $R_f$.[13]  Otherwise, the model collapses, and it would be imprudent to assume any risk without achieving an associated return above the benchmark returns.

72.    The Large Cap Equity Fund is a custom investment alternative established for exclusive use by the plans in the Master Trust, including the Plan.  The Fund has failed to demonstrate an ability to beat its benchmark, the Russell 1000 Index, over a trailing five- or ten-year period, per the data points available to Plaintiff through Plan literature:

---

[13]In this instance, the index benchmark takes the place of the "risk-free" rate, as the investment option is measured against the performance of that investment category, rather than the typical U.S. Treasury Bonds or equivalent government security in a general CAPM calculation.

CLASS ACTION COMPLAINT
-26-

| Large Cap Equity Fund Outperformance v Benchmark | | | | | | |
|---|---|---|---|---|---|---|
| | 5-Year Annualized Returns | | | 10-Year Annualized Returns | | |
| As of | Fund | Benchmark | Diff | Fund | Benchmark | Diff |
| 4Q2018 | 7.1% | 8.2% | -1.1% | 12.7% | 13.3% | -0.6% |
| 4Q2019 | 10.6% | 11.5% | -0.9% | 12.5% | 13.5% | -1.0% |
| 2Q2020 | 8.4% | 10.5% | -2.1% | 12.4% | 14.0% | -1.6% |

73.    As discussed above, active managers face an uphill battle to provide value by consistently beating their benchmarks with the additional obstacle of high fees, compared to those funds that simply track the benchmark.  Given the presence in the Plan lineup of an index fund that already tracks the large cap domestic market (the S&P 500 Index Fund), there was and is no reason to include an actively managed fund in the U.S. large cap space, particularly not one so poor.  Indeed, Morningstar concluded in its year-end 2018 report on active vs passive management that long term success rates (a fund's ability to survive and outperform a low-cost index fund tracking its benchmark over longer time horizons) were lowest among U.S. large cap funds.  Defendants' misguided decision to create and retain the Fund, an actively managed U.S. large cap, was exacerbated by the Fund's complete inability to provide participants sufficient value to justify its 30 basis point (0.30%) expense ratio.  In contrast, the Plan's index option that tracks the S&P 500 Index charges a measly 5 basis points (0.05%).  Indeed, it was a severe breach of fiduciary duty for Defendants to retain an investment option that, for six times the cost of an alternative fund in the same category, failed to produce returns to match, much less exceed, the alternative.

iii.    The Custom Small/Mid Cap Equity Fund

74.    The Small/Mid Cap Equity Fund is a custom investment alternative established for exclusive use by the plans in the Master Trust, including the Plan.  The Fund suffers from the same performance failures as the custom Large Cap Equity Fund; it has failed to demonstrate an ability to beat its benchmark, the Russell 2500 Index, over a trailing five- or ten-year period, per the data points available to Plaintiff through Plan literature:

| Small/Mid Cap Equity Fund Outperformance v Benchmark | | | | | | |
|---|---|---|---|---|---|---|
| | 5-Year Annualized Returns | | | 10-Year Annualized Returns | | |
| As of | Fund | Benchmark | Diff | Fund | Benchmark | Diff |
| 4Q2018 | 3.8% | 5.1% | -1.3% | 12.6% | 13.2% | -0.6% |
| 4Q2019 | 8.6% | 8.9% | -0.3% | 11.4% | 12.6% | -1.2% |
| 2Q2020 | 3.8% | 5.4% | -1.6% | 9.5% | 11.5% | -2.0% |

75.     Again, active managers face an uphill battle to provide value by consistently beating their benchmarks with the additional obstacle of high fees, compared to those funds that simply track the benchmark.  Given the presence in the Plan lineup of an index fund that already tracks the small/mid cap domestic market (the Small/Mid Cap Equity Index Fund[14]), there was and is no reason to include an actively managed fund in the U.S. small/mid cap space, particularly not one so poor.  Defendants' misguided decision to create and retain the Fund was exacerbated by the Fund's complete inability to provide participants sufficient value to justify its 46 basis point (0.46%) expense ratio.  In contrast, the Plan's index option charges just 6 basis points (0.06%).  Indeed, it was a severe breach of fiduciary duty for Defendants to retain an investment option that, for nearly eight times the cost of an alternative fund in the same category, failed to produce returns to match, much less exceed, the alternative.

iv.     The Custom Non-U.S. Equity Fund

76.     The Non-U.S. Equity Fund is a custom investment alternative established for exclusive use by the plans in the Master Trust, including the Plan.  The Fund has also repeatedly failed to beat its benchmark, the MSCI ACWI ex U.S. Index, over a trailing five- or ten-year period, per the data points available to Plaintiff through Plan literature:

---

[14]The Small/Mid Cap Equity Index Fund tracks the Dow Jones U.S. Completion Total Stock Market Index, which, according to the Fund's fact sheet, represents the small and mid-cap segments of the U.S. market.

| Non-US Equity Fund Outperformance v Benchmark | | | | | | |
|---|---|---|---|---|---|---|
| | 5-Year Annualized Returns | | | 10-Year Annualized Returns | | |
| As of | Fund | Benchmark | Diff | Fund | Benchmark | Diff |
| 4Q2018 | -0.2% | 0.7% | -0.9% | 4.6% | 6.6% | -2.0% |
| 4Q2019 | 5.2% | 5.5% | -0.3% | 3.7% | 5.0% | -1.3% |
| 2Q2020 | 1.4% | 2.3% | -0.9% | 4.1% | 5.0% | -0.9% |

77.     As demonstrated above, the active managers Defendants selected for the plan have failed to provide value by consistently beating their benchmarks with the additional obstacle of high fees.  The Plan lineup includes an index fund that already tracks the MSCI ACWI ex U.S. Index (the Non-U.S. Equity Index Fund).  Accordingly, there was and is no reason to include the actively managed Non-U.S. Equity Fund that has shown zero ability to provide participants sufficient value to justify its 39 basis point (0.39%) expense ratio.  In contrast, the Plan's index option charges just 11 basis points (0.11%).  Indeed, it was a severe breach of fiduciary duty for Defendants to retain an investment option that, for nearly four times the cost of an alternative fund in the same category, failed to produce returns to match, much less exceed, the alternative.

## V.     ERISA'S FIDUCIARY STANDARDS

78.     ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendants as fiduciaries of the Plan.  Section 404(a) of ERISA, 29 U.S.C. § 1104(a), states, in relevant part, as follows:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and -
>
> (A)     for the exclusive purpose of
>
> > (i)     providing benefits to participants and their beneficiaries; and
> > (ii)    defraying reasonable expenses of administering the plan;
>
> > [and]
>
> (B)     with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like

capacity and familiar with such matters would use in the conduct
of an enterprise of like character and with like aims.

79.     Under 29 U.S.C. § 1103(c)(l), with certain exceptions not relevant here, the assets

of a plan shall never inure to the benefit of any employer and shall be held for the exclusive

purposes of providing benefits to participants in a plan and their beneficiaries and defraying

reasonable expenses of administering the plan.

80.     Under ERISA, parties that exercise any authority or control over plan assets,

including the selection of plan investments and service providers, are fiduciaries and must act

prudently and solely in the interest of participants in a plan.

81.     ERISA's fiduciary duties are "the highest known to the law" and must be

performed "with an eye single" to the interests of participants. *Donovan v. Bierwirth*, 680 F.2d

263, 271, 272 n. 8 (2d Cir. 1982).

82.     ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries.  Section

405(a) of ERISA, 29 U.S.C. § 1105(a) provides a cause of action against a fiduciary for

knowingly participating in a breach by another fiduciary and knowingly failing to cure any

breach of duty.  ERISA states, in relevant part, as follows:

> In addition to any liability which he may have under any other
> provision of this part, a fiduciary with respect to a plan shall be liable
> for a breach of fiduciary responsibility of another fiduciary with
> respect to the same plan in the following circumstances:
>
> (1)     if he participates knowingly in, or knowingly
>         undertakes to conceal, an act or omission of such other
>         fiduciary, knowing such act or omission is a breach; or
>
> (2)     if, by his failure to comply with section 404(a)(l) in the
>         administration of his specific responsibilities which
>         give risk to his status as a fiduciary, he has enabled such
>         other fiduciary to commit a breach; or
>
> (3)     if he has knowledge of a breach by such other fiduciary,
>         unless he makes reasonable efforts under the
>         circumstances to remedy the breach.

83.     Section 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under Section 409, 29 U.S.C. § 1109.  Section 409(a) of ERISA provides, in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

## VI.    <u>CLASS ALLEGATIONS</u>

84.     This action is brought as a class action by Plaintiffs on behalf of themselves and the following proposed class (the "Class"):

> All participants and beneficiaries in the Fluor Corporation Employees' Savings Investment Plan (the "Plan") at any time on or after January 24, 2022 to the date of judgment or such other earlier date that the Court determines is appropriate and just (the "Class Period"), including any beneficiary of a deceased person who was a participant in the Plan at any time during the Class Period.

Excluded from the Class are Defendants and the Judge to whom this case is assigned or any other judicial officer having responsibility for this case who is a beneficiary.

85.     This action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

86.     **Numerosity**.  Plaintiffs are informed and believe that there are at least thousands of Class members throughout the United States.  As a result, the members of the Class are so numerous that their individual joinder in this action is impracticable.

87.     **Commonality**.  There are numerous questions of fact and/or law that are common to Plaintiffs and all the members of the Class, including, but not limited to the following:

(a)   Whether Defendants failed and continue to fail to discharge their duties with respect to the Plan solely in the interest of the Plan's participants for the exclusive purpose of providing benefits to participants and their beneficiaries;

(b)   Whether Defendants breached their fiduciary duties under ERISA by failing to defray the reasonable expenses of administering the Plan; and

(c)   Whether and what form of relief should be afforded to Plaintiffs and the Class.

88.   **Typicality**.  Plaintiffs, who are members of the Class, have claims that are typical of all of the members of the Class.  Plaintiffs' claims and all of the Class members' claims arise out of the same uniform course of conduct by Defendants and arise under the same legal theories that are applicable as to all other members of the Class.  In addition, Plaintiffs seek relief for the Plan under the same remedial theories that are applicable as to all other members of the Class.

89.   **Adequacy of Representation**.  Plaintiffs will fairly and adequately represent the interests of the members of the Class.  Plaintiffs have no conflicts of interest with or interests that are any different from the other members of the Class.  Plaintiffs have retained competent counsel experienced in class action and other complex litigation, including class actions under ERISA.

90.   **Potential Risks and Effects of Separate Actions**.  The prosecution of separate actions by or against individual Class members would create a risk of: (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the Class; or (B) adjudications with respect to individual Class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

91.     **Predominance**.  Common questions of law and fact predominate over questions affecting only individual Class members, and the Court, as well as the parties, will spend the vast majority of their time working to resolve these common issues.  Indeed, virtually the only individual issues of significance will be the exact amount of damages recovered by each Class member, the calculation of which will ultimately be a ministerial function and which does not bar Class certification.

92.     **Superiority**.  A class action is superior to all other feasible alternatives for the resolution of this matter.  The vast majority of, if not all, Class members are unaware of Defendants' breaches of fiduciary duty and prohibited transactions such that they will never bring suit individually.  Furthermore, even if they were aware of the claims they have against Defendants, the claims of virtually all Class members would be too small to economically justify individual litigation.  Finally, individual litigation of multiple cases would be highly inefficient, a gross waste of the resources of the courts and of the parties, and potentially could lead to inconsistent results that would be contrary to the interests of justice.

93.     **Manageability**.  This case is well-suited for treatment as a class action and easily can be managed as a class action since evidence of both liability and damages can be adduced, and proof of liability and damages can be presented, on a Class-wide basis, while the allocation and distribution of damages to Class members would be essentially a ministerial function.

94.     Defendants have acted on grounds generally applicable to the Class by uniformly subjecting them to the breaches of fiduciary duty described above.  Accordingly, injunctive relief, as well as legal and/or equitable monetary relief (such as disgorgement and/or restitution), along with corresponding declaratory relief, are appropriate with respect to the Class as a whole.

95.     Plaintiffs' counsel will fairly and adequately represent the interests of the Class and are best able to represent the interests of the Class under Rule 23(g) of the Federal Rules of

Civil Procedure.  Moreover, treating this case as a class action is superior to proceeding on an individual basis and there will be no difficulty in managing this case as a class action.

96.     Therefore, this action should be certified as a class action under Rules 23(a) and 23(b)(1) and/or 23(b)(3) of the Federal Rules of Civil Procedure.

## COUNT I
### (For Breach of Fiduciary Duty)

97.     Plaintiffs incorporate by reference the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

98.     Defendants' conduct, as set forth above, violates their fiduciary duties under Sections 404(a)(1)(A), (B) and (D) of ERISA, 29 U.S.C. § 1104(a)(1)(A), (B) and (D), in that Defendants failed and continue to fail to discharge their duties with respect to the Plan solely in the interest of the Plan's participants and beneficiaries and (a) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the Plan with (b) the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, and (c) by failing to act in accordance with the documents and instruments governing the Plan.  In addition, as set forth above, Defendants violated their respective fiduciary duties under ERISA to monitor other fiduciaries of the Plan in the performance of their duties.

99.     To the extent that any of the Defendants did not directly commit any of the foregoing breaches of fiduciary duty, at the very minimum, each such Defendant is liable under 29 U.S.C. § 1105(a) because he, she, they or it was a co-fiduciary and knowingly participated in (or concealed) a breach by another fiduciary, enabled another fiduciary to commit breaches of fiduciary duty in the administration of his, her, their or its specific responsibilities giving rise to

his, her, their or its fiduciary status and/or knowingly failing to cure a breach of fiduciary duty by another fiduciary and/or failed to take reasonable efforts to remedy the breach.

100.     As a direct result of Defendants' breaches of duties, the Plan has suffered losses and damages.

101.     Pursuant to Sections 409 and 502(a)(2) of ERISA, 29 U.S.C. §§ 1109 and 1132, Defendants are liable to restore to the Plan the losses that have been suffered as a direct result of Defendants' breaches of fiduciary duty and are liable for damages and any other available equitable or remedial relief, including prospective injunctive and declaratory relief, and attorneys' fees, costs and other recoverable expenses of litigation.

## <u>COUNT II</u>
### (Failure to Monitor Fiduciaries and Co-Fiduciary Breaches)

102.     Plaintiffs incorporate the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

103.     Fluor is responsible for appointing, overseeing, and removing members of the Committees, who, in turn, are responsible for appointing, overseeing, and removing members of the Committees.

104.     In light of its appointment and supervisory authority, Fluor had a fiduciary responsibility to monitor the performance of the Committees and their members.  In addition, Fluor and the Committees had a fiduciary responsibility to monitor the performance of the members of the respective Committees.

105.     A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of Plan assets, and must take prompt and effective action to protect the Plan and participants when they are not.

106.     To the extent that fiduciary monitoring responsibilities of Fluor or the

Committees was delegated, each Defendant's monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently and loyally.

107.    Fluor and the Committees breached their fiduciary monitoring duties by, among other things:

>    (a)   Failing to monitor and evaluate the performance of its appointees or have a system in place for doing so, standing idly by as the Plan suffered enormous losses as a result of the appointees' imprudent actions and omissions with respect to the Plan;

>    (b)   Failing to monitor its appointees' fiduciary processes, which would have alerted a prudent fiduciary to the breaches of fiduciary duties described herein, in clear violation of ERISA; and

>    (c)   Failing to remove appointees whose performances were inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, all to the detriment of the Plan and its participants' retirement savings.

108.    As a consequence of these breaches of the fiduciary duty to monitor, the Plan suffered substantial losses.  Had Fluor and the Committees discharged their fiduciary monitoring duties prudently as described above, the losses suffered by the Plan would have been minimized or avoided.  Therefore, as a direct result of the breaches of fiduciary duties alleged herein, the Plan and its participants have lost millions of dollars of retirement savings.

109.    Fluor and the Committees are liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count, to restore to the Plan any profits made through use of Plan assets, and are subject to other equitable or remedial relief as appropriate.

110.    Each of the Defendants also knowingly participated in the breaches of the other Defendants, knowing that such acts were constituted breaches; enabled the other Defendants to commit breaches by failing to lawfully discharge their own fiduciary duties; and knew of the

breaches by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breaches.  Defendants, thus, are liable for the losses caused by the breaches of their co-fiduciaries under 29 U.S.C. § 1105(a).

## COUNT III
### (In the Alternative, Liability for Knowing Breach of Trust)

111.    Plaintiffs incorporate the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

112.    In the alternative, to the extent that any of the Defendants are not deemed a fiduciary or co-fiduciary under ERISA, each such Defendant should be enjoined or otherwise subject to equitable relief as a non-fiduciary from further participating in a knowing breach of trust.

113.    To the extent any of the Defendants are not deemed to be fiduciaries and/or are not deemed to be acting as fiduciaries for any and all applicable purposes, any such Defendants are liable for the conduct at issue here, since all Defendants possessed the requisite knowledge and information to avoid the fiduciary breaches at issue here and knowingly participated in breaches of fiduciary duty by permitting the Plan to offer a menu of imprudent investment options and pay unreasonable recordkeeping and administrative fees, all of which was unjustifiable in light of the size and characteristics of the Plan.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves, the Class and the Plan, demands judgment against Defendants, for the following relief:

(a)    Declaratory and injunctive relief pursuant to Section 502 of ERISA, 29 U.S.C. § 1132, as detailed above;

(b)    Equitable, legal or remedial relief to return all losses to the Plan and/or for restitution and/or damages as set forth above, plus all other equitable or remedial relief as

the Court may deem appropriate pursuant to Sections 409 and 502 of ERISA, 29 U.S.C.

§§ 1109 and 1132;

(c)     Pre-judgment and post-judgment interest at the maximum permissible rates,

whether at law or in equity;

(d)     Attorneys' fees, costs and other recoverable expenses of litigation; and

(e)     Such further and additional relief to which the Plan may be justly entitled and the

Court deems appropriate and just under all of the circumstances.

## JURY DEMAND

Plaintiffs demand a jury trial with respect to all claims so triable.

## NOTICE PURSUANT TO ERISA § 502(h)

To ensure compliance with the requirements of ERISA § 502(h), 29 U.S.C. § 1132(h),

the undersigned hereby affirms that, on this date, a true and correct copy of this Complaint was

served upon the Secretary of Labor and the Secretary of the Treasury by certified mail, return

receipt requested.

DATED: January 24, 2022                        Respectfully submitted,

                                               /s/ Anthony L. Vitullo
                                               Anthony L. Vitullo
                                               Fee, Smith, Sharp & Vitullo LLP
                                               Three Galleria Tower
                                               13155 Noel Road, Suite 1000
                                               Dallas, Texas 75240
                                               Telephone: (972) 934-9100
                                               Facsimile: (972) 934-9200
                                               Email: lvitullo@feesmith.com

                                               James E. Miller
                                               Laurie Rubinow
                                               Miller Shah LLP
                                               65 Main Street
                                               Chester, CT 06412
                                               Telephone: (866) 540-5505
                                               Facsimile: (866) 300-7367
                                               Email: jemiller@millershah.com
                                                        lrubinow@millershah.com

                                               James C. Shah

Alec J. Berin
Miller Shah LLP
1845 Walnut Street, Suite 806
Philadelphia, PA 19103
Telephone: (866) 540-5505
Facsimile: (866) 300-7367
Email: jcshah@millershah.com
       ajberin@millershah.com

Kolin C. Tang
Miller Shah LLP
19712 MacArthur Blvd.
Irvine, CA 92612
Telephone: (866) 540-5505
Facsimile: (866) 300-7367
Email: kctang@millershah.com

*Attorneys for Plaintiffs, the Plan
and the Proposed Class*