**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| DEBORAH LOCASCIO and DAVID SUMMERS, Individually and as a representatives of a class of similarly situated persons, on behalf of the FLUOR CORPORATION EMPLOYEES' SAVINGS INVESTMENT PLAN, <br><br> Plaintiffs, <br><br> v. <br><br> FLUOR CORPORATION, THE FLUOR CORPORATION BENEFITS ADMINISTRATIVE COMMITTEE, THE FLUOR CORPORATION RETIREMENT PLAN INVESTMENT COMMITTEE, and MERCER INVESTMENTS, LLC a/k/a MERCER INVESTMENT MANAGEMENT, <br><br> Defendants. | CASE NO. 3:22-cv-00154-X <br><br><br><br> **CLASS ACTION COMPLAINT** <br><br> JURY TRIAL DEMANDED |

## I.     **INTRODUCTION**

1.      Pursuant to Fed.R.Civ.P. 15(a), Plaintiffs, Deborah Locascio ("Locascio") and

David Summers ("Summers") (collectively, "Plaintiffs"), individually in their capacity as former

participants of the Fluor Corporation Employees' Savings Investment Plan ("Plan"), file this

Amended Class Action Complaint ("Complaint"), and bring this action under 29 U.S.C. § 1132,

on behalf of the Plan and a class of similarly-situated participants, against Defendants, Fluor

Corporation ("Fluor"), the Fluor Corporation Benefits Administrative Committee

("Administrative Committee"), the Fluor Corporation Retirement Plan Investment Committee

("Investment Committee") (collectively, "Committees") and Mercer Investments, LLC a/k/a

Mercer Investment Management, who are members of the Committees or other fiduciaries of the

Plan and whose names are currently unknown (collectively, "Defendants"), for breach of their

fiduciary duties under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §

1001, *et seq.*, and related breaches of applicable law beginning six years prior to the date this action is filed and continuing to the date of judgment or such earlier date that the Court determines is appropriate and just (the "Class Period").

2.     Defined contribution plans (e.g., 401(k) and 403(b) plans) that are qualified as tax-deferred vehicles have become the primary form of retirement saving in the United States and, as a result, America's *de facto* retirement system.  Unlike traditional defined benefit retirement plans, in which the employer typically promises a calculable benefit and assumes the risk with respect to high fees or under-performance of pension plan assets used to fund defined benefits, 401(k) and 403(b) plans operate in a manner in which participants bear the risk of high fees and investment underperformance.

3.     The importance of defined contribution plans to the United States retirement system has become pronounced as employer-provided defined benefit plans have become increasingly rare as an offered and meaningful employee benefit.

4.     As of December 31, 2020, the Plan had 15,062 participants with account balances and assets totaling approximately $3.45 billion, placing it in the top 0.1% of all defined contribution plans by plan size.[1]  Defined contribution plans with substantial assets, like the Plan, have significant bargaining power and the ability to demand low-cost administrative and investment management services within the marketplace for administration of defined contribution plans and the investment of defined contribution assets.  The marketplace for defined contribution retirement plan services is well-established and can be competitive when fiduciaries of defined contribution retirement plans act in an informed and prudent fashion.

5.     Defendants maintain the Plan, and are responsible for selecting, monitoring, and retaining the service provider(s) that provide investment, recordkeeping, and other administrative

---

[1]The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2017 (pub. August 2020).

services and/or providing investment management services to the Plan.  Defendants are

fiduciaries under ERISA, and, as such, owe a series of duties to the Plan and its participants and

beneficiaries, including obligations to act for the exclusive benefit of participants, ensure that the

investment options offered through the Plan are prudent and diverse, and ensure that Plan

expenses are fair and reasonable.

6.      Defendants have breached their fiduciary duties to the Plan.  As detailed below,

Defendants: (1) failed to fully disclose the expenses and risk of the Plan's investment options to

participants; (2) allowed unreasonable expenses to be charged to participants; and (3) selected,

retained, and/or otherwise ratified high-cost and poorly-performing investments, instead of

offering more prudent alternative investments when such prudent investments were readily

available at the time Defendants selected and retained the funds at issue and throughout the Class

Period.

7.      To remedy these fiduciary breaches and other violations of ERISA, Plaintiffs

bring this class action under Sections 404, 409 and 502 of ERISA, 29 U.S.C. §§ 1104, 1109 and

1132, to recover and obtain all losses resulting from each breach of fiduciary duty.  In addition,

Plaintiffs seek such other equitable or remedial relief for the Plan and the proposed class

("Class") as the Court may deem appropriate and just under all of the circumstances.

8.      Plaintiffs specifically seek the following relief on behalf of the Plan and the Class:

a.      A declaratory judgment holding that the acts of Defendants described

herein violate ERISA and applicable law;

b.      A permanent injunction against Defendants prohibiting the practices

described herein and affirmatively requiring them to act in the best

interests of the Plan and its participants;

c.      Equitable, legal or remedial relief for all losses and/or compensatory

damages;

    d.      Attorneys' fees, costs and other recoverable expenses of litigation; and

    e.      Such other and additional legal or equitable relief that the Court deems appropriate and just under all of the circumstances.

## II.    <u>THE PARTIES</u>

9.    Locascio is a former employee of Fluor and is a former participant in the Plan under 29 U.S.C. § 1002(7).  Locascio is a resident of Sugar Land, Texas.  During the Class Period, Locascio maintained an investment through the Plan in the Total Bond Index Fund, the S&P 500 Index Fund, the Small/Mid Cap Equity Index Fund, the Non-U.S. Equity Index Fund, and the Fluor Corporation Common Stock Fund and was subject to the excessive costs alleged below and a Plan that maintained poor investments with excessive investment management fees, as detailed below.

10.    Summers is a former employee of Fluor and is a former participant in the Plan under 29 U.S.C. § 1002(7).  Summers is a resident of Rockdale, Texas.  During the Class Period, Locascio maintained an investment through the Plan in the Fluor Target Date 2030 Fund, the Fluor Target Date 2055 Fund, the Stable Value Fund, the Total Bond Index Fund, the Diversified Bond Fund, the S&P 500 Index Fund, the Small/Mid Cap Equity Fund, and the Fluor Corporation Common Stock Fund and was subject to the excessive costs alleged below and a Plan that maintained poor investments with excessive investment management fees, as detailed below.

11.    Fluor is a Delaware domestic corporation headquartered in Irving, Texas.  Fluor is a global engineering, procurement, construction and maintenance company that purports to design, build and maintain "the world's toughest projects."

12.    The Administrative Committee is the Plan administrator and is a fiduciary under ERISA pursuant to 29 U.S.C. §§ 1002 and 1102.  The Administrative Committee exercises discretionary authority and control to administer, construe, and interpret the Plan and its assets.

The Administrative Committee maintains its address at Fluor's corporate headquarters in Irving, Texas.  The Administrative Committee and its members are appointed by Fluor to administer the Plan on Fluor's behalf.

13.     The Investment Committee is established by Fluor to assist Fluor with the selection of investment funds offered for selection by Plan participants and is a fiduciary under ERISA pursuant to 29 U.S.C. §§ 1002 and 1102.  The Investment Committee exercises authority or control in selecting and monitoring the Plan's assets.  The Investment Committee maintains its address at Fluor's corporate headquarters in Irving, Texas.  The Investment Committee has "the authority to manage the assets of the Plan, including through determining the Plan's investment options, monitoring the diversity of such investment options, and providing investment direction to the Trustee."

14.     Defendant, Mercer Investments, LLC a/k/a Mercer Investment Management ("Mercer") serves as the Plan's designated fiduciary investment adviser pursuant to ERISA §3(38), 29 U.S.C. § 1002(38), and has served in that capacity since in or about the first quarter of 2017.  Mercer maintains its corporate headquarters in Boston, Massachusetts.  Although Mercer has served as the Plan's investment adviser since 2017, it has utterly failed in its fiduciary duties.  Not only did Mercer fail to remove poor investments in the Plan when it began serving as the fiduciary investment adviser for the Plan, it likewise failed to act to eliminate those investment options when that poor performance persisted.  Likewise, the remaining Defendants clearly failed to adequately monitor the performance of Mercer during the period (since 2017) it has served as a fiduciary investment adviser (despite its fiduciary obligation to do so) because any modicum of adequate monitoring would have revealed that Mercer was failing to perform its duties in a prudent and reasonable manner.

### III.     JURISDICTION AND VENUE

15.     Plaintiffs seek relief on behalf of the Plan pursuant to ERISA's civil enforcement remedies with respect to fiduciaries and other interested parties and, specifically, under 29 U.S.C. § 1109 and 29 U.S.C. § 1132.

16.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States.

17.      Venue is proper in this District pursuant to Section 502(e) of ERISA, 29 U.S.C. § 1332(e), and 28 U.S.C. § 1391 because Fluor's principal place of business is in this District and the Plan is administered from this judicial district.  Furthermore, a substantial part of the acts and omissions giving rise to the claims asserted herein occurred in this District.

18.     Plaintiffs have standing to bring this action.  Section 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2), authorizes any participant, fiduciary or the Secretary of Labor to bring suit as a representative of a plan, with any recovery necessarily flowing to a plan.  As explained herein, the Plan has suffered millions of dollars in losses resulting from Defendants' fiduciary breaches and remains vulnerable to continuing harm, all redressable by this Court.  In addition, although standing under Section 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2), is established by these Plan-wide injuries, Plaintiffs and all Plan participants suffered financial harm as a result of the Plan's imprudent investment options and excessive investment management and related fees, and were deprived of the opportunity to invest in prudent options with reasonable fees, among other injuries.

### IV.     FACTUAL ALLEGATIONS

A.     **Background and Plan Structure**

19.     The Plan is a single-employer 401(k) plan, in which participants direct the investment of their contributions into various investment options offered by the Plan.  Each participant's account is credited with the participant contributions, employer matching contributions, any discretionary contributions, and earnings or losses thereon.  The Plan pays Plan expenses from Plan assets, and the majority of administrative and investment management expenses are paid by participants as a reduction of investment income.  Each participant's account is charged with the amount of distributions taken and an allocation of administrative and investment management expenses.  The available investment options for participants of the Plan include custom investment funds set up as separate accounts, Fluor common stock, and a self-directed brokerage account, as well as a so-called "managed account" product provided by the Plan's recordkeeper, as more fully discussed below.

20.     The Plan's investment alternatives are custom options set up as separate accounts that are managed either exclusively for the Plan or on a commingled basis for the Plan and other institutional investors.  Each custom fund operates under guidelines established between the Fluor Corporation Master Retirement Trust ("Master Trust") and the respective investment manager appointed by the Investment Committee.  The custom investment funds are not mutual funds and, accordingly, are not regulated by the Securities and Exchange Commission ("SEC").

21.     The Plan operates, in part, as an employee stock ownership plan, which enables Fluor employees to acquire an ownership interest in the company through units of Fluor Corporation Common Stock Fund.  The fund operates as a unitized fund, meaning participant accounts invest in units which represent a *pro rata* interest in the Plan's investment in Fluor stock and cash or cash equivalents, which are held in a trust fund.  Plan participants are prohibited from investing more than 20% of their account balance in the stock fund.

22.     Voya Financial ("Voya") has served as the Plan's recordkeeper since mid-2017, when the Plan's relationship with Aon Hewitt was terminated.  Aon Hewitt had served as the plan's recordkeeper from the beginning of the Class Period.  As the recordkeeper, Voya is responsible for maintaining records with respect to employees' accounts in the Plan, effectuating participant Plan investment elections, and performing administrative functions such as processing loan and withdrawal requests.  Voya also offers the Plan participants a managed account product (the "Managed Account"), pursuant to which Voya makes decisions for participants who elect this option regarding the allocation of their assets based upon the investments offered within the Plan by Defendants and based upon their demographic characteristics and expressed preferences regarding risk tolerance and investment objectives.

23.     During the Class Period, Plan assets were held in the Master Trust by the primary custodian of the Plan, the Northern Trust Company.  All investments and asset allocations are performed through this trust fund, which holds the investments of the Plan and various other employee benefit plans sponsored by Fluor and certain of its subsidiaries and affiliates.  The Plan's assets represent approximately 99% of the total assets in the Master Trust.

24.     During the Class Period, participants paid Aon Hewitt, and then, starting in 2017, Voya (which is the current incarnation of ING Life Insurance & Annuity Company), for recordkeeping and administrative services through direct charges to their accounts and indirectly through asset-based revenue sharing.  Prior to 2017, the Plan did not have a designated fiduciary investment adviser and appears to have relied upon Aon Hewitt for any investment advice it received.

**B.**     **The Defined Contribution Industry and the Impact of Fees and Costs.**

25.     Failures by ERISA fiduciaries to monitor fees and costs for reasonableness, such as those identified herein, have stark financial consequences for retirees.  Every extra level of expenses imposed upon plan participants compounds over time and reduces the value of

participants' investments available upon retirement.  Over time, even small differences in fees compound and can result in vast differences in the amount of a participant's savings available at retirement.  As the Supreme Court has explained, "[e]xpenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan." *Tibble v. Edison Int'l*, 575 U.S. 523, 525 (2015).

26.     The impact of excessive fees on a plan's employees' and retirees' retirement assets is dramatic.  The U.S. Department of Labor ("DOL") has noted that a 1% higher level of fees over a 35-year period makes a 28% difference in retirement assets at the end of a participant's career.[2]

27.     Plan participants typically have little appreciation of the fees being assessed to their accounts.  Indeed, according to a 2017 survey conducted by TD Ameritrade, only 27% of investors believed they knew how much they were paying in fees as participants in defined contribution plans, and 37% were unaware that they paid defined contribution Plan fees at all.[3]  It is incumbent upon plan fiduciaries to act for the exclusive best interest of plan participants, protect their retirement dollars, and ensure that fees are and remain reasonable for the services provided, and are properly and fully disclosed.  Unfortunately, fiduciaries of defined contribution retirement plans, including large retirement plans like the Plan, also often lack understanding of the fees being charged to the plans that they administer, manage and control in derogation of their fiduciary duties.

## C.     Defendants' Breaches of Fiduciary Duties

28.     As discussed in detail below, Defendants have severely breached their fiduciary duties of prudence and/or loyalty to the Plan in several significant ways.  Plaintiffs did not

---

[2]*A Look at 401(k) Plan Fees*, UNITED STATES DEPT. OF LABOR at 1-2 (Sept. 2019), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resourcecenter/publications/a-look-at-401k-plan-fees.pdf (last visited December 5, 2021).

[3]*See* https://s2.q4cdn.com/437609071/files/doc_news/research/2018/Investor-Sentiment-Infographic-401k-fees.pdf (last visited December 5, 2021).

acquire actual knowledge regarding Defendants' breaches at issue here until shortly before this Complaint was filed.

       **1.**       **The Plan's Objectively Imprudent Investment Options**

29.      Several of the Plan's custom investment options are objectively imprudent, separate and apart from the apparent excesses with respect to the Plan's investment management fees, as well as its relationship with and payments to Voya, which the Plan entered into at Defendants' behest.

       i.      <u>The Custom Target Date Funds</u>

30.      Among other investments, the Plan lineup offers a suite of nine custom target date funds ("Fluor TDFs"). [4]  The Fluor TDFs are custom investment alternatives established for exclusive use by the plans in the Master Trust, including the Plan.  The Fluor TDFs are managed by BlackRock, Inc. ("BlackRock"), and essentially mirror the BlackRock LifePath Index Funds ("BlackRock TDFs"), a collective trust target date fund suite.

31.      A target date fund ("TDF") is an investment vehicle that offers an all-in-one retirement solution through a portfolio of underlying funds that gradually shifts to become more conservative as the assumed target retirement year approaches.  TDFs offer investors dynamic, easy asset allocation, while providing both long-term growth and capital preservation. Defendants were responsible for crafting the Plan lineup and could have chosen any TDF family but elected to retain the Fluor TDFs instead, an imprudent decision that has cost Plan participants significant growth in their retirement assets.  The Fluor TDFs are significantly worse performing than many of the mutual fund alternatives offered by TDF providers.  Any objective evaluation of the Fluor TDFs would have resulted in an examination of and selection of a more consistent

---

[4] The Plan offered a tenth target date fund, the 2020 vintage, for the majority of the Class Period.  On November 18, 2019, the 2020 Fund was reorganized into the Retirement Fund, and shareholders of the 2020 Fund received shares of the Retirement Fund.

and better performing and more appropriate TDF suite than the Fluor TDFs. Given the relative superiority of alternative TDF suites, in creating and retaining the Fluor TDFs, Defendants clearly failed to carry out their responsibilities in a single-minded manner with an eye focused solely on the interests of the participants. Had Defendants acted in the sole interest of Plan participants by, for example, simply weighing the benefits of the Fluor TDFs against readily available alternative TDFs, Defendants would have concluded that the Fluor TDFs represented a clearly inferior option and were therefore an inappropriate offering in the Plan lineup.

32.     Exacerbating Defendants' imprudent choice to add and retain the Fluor TDFs is the suite's role as the Plan's Qualified Default Investment Alternative ("QDIA") for as long as it has been an option in the Plan investment menu. A retirement plan can designate one of the investment offerings from its lineup as a QDIA to aid participants who lack the knowledge or confidence to make investment elections for their retirement assets; if participants do not direct where their assets should be invested, all contributions are automatically invested in the QDIA. Plan fiduciaries are responsible for the prudent selection and monitoring of an appropriate QDIA. The Fluor TDF with the target year that is closest to a participant's assumed retirement age (age 65) has served as the QDIA in the Plan throughout the pertinent period.

33.     Given the vast majority of plan participants in general, of which the Plan participants are no exception, are not sophisticated investors, they largely, by default, concentrate their retirement assets in TDFs. As such, the impact of Defendants' imprudent selection of TDFs is magnified vis-à-vis other asset categories. Indeed, throughout the Class Period, approximately 31%-34% of the Plan's assets were invested in the Fluor TDFs.

34.     Measured against appropriate, available alternative TDF suites, the Fluor TDFs are a vastly inferior retirement solution. Throughout the Class Period, there were many TDF offerings that consistently and dramatically outperformed the Fluor TDFs, providing investors with substantially more capital appreciation. It is apparent, given the continued presence of the

Fluor TDFs in the Plan's investment menu, that Defendants failed to scrutinize the performance of the Fluor TDFs against any of the more appropriate alternatives in the TDF marketplace. Accordingly, the Plan's investment in the Fluor TDFs has resulted in participants missing out on millions of dollars in retirement savings growth that could have been achieved through an investment in any of the below proposed alternative TDFs, and indeed many other options.

35.     A prudent fiduciary evaluates TDF returns not only against an appropriate index or a group of peer TDFs, but also against specific, readily investable alternatives to ensure that participants are benefitting from the current TDF offering.  By the specific data points available to Plaintiffs through Plan literature, the returns of the Fluor TDFs have been dwarfed across the board by those of a representative group of TDFs available off-the-shelf[5] ("Off-the-Shelf TDFs").  The below performance data, comparing the three- and five-year[6] annualized returns of several representative vintages of the Fluor TDFs to those of the same iterations of the Off-the-Shelf TDFs, represents information easily accessible to Defendants during the Class Period. Defendants could have sought this comparative returns data at any time from Aon Hewitt/Voya in their capacity as recordkeepers (since both institutions regularly provide such data to their customers), as well as from Mercer once it became the Plan's fiduciary investment adviser in 2017, or, in the alternative, obtained it themselves in real time through just a few clicks of a computer mouse.

---

[5]The Off-the-Shelf TDFs consist of the American Funds Target Date Funds Class R6 ("American TDFs"), the Fidelity Freedom Index Funds Investor Class ("Fidelity TDFs"), the State Street Target Retirement Funds Class K ("State Street TDFs"), the T. Rowe Price Retirement Funds ("T. Rowe Price TDFs"), and the TIAA-CREF Lifecycle Index Funds Institutional Class ("TIAA-CREF TDFs").

[6]Investment professionals and investment policy statements for virtually all competently managed defined contribution retirement plans appropriately recognize that the three-year and five-year annualized returns are the most important metrics for evaluating whether investment options should be maintained in a retirement plan lineup.

| Returns as of 4Q2018 | | |
|---|---|---|
| **2025 Fund** | **3-Year** | **5-Year** |
| American TDFs | 6.12% | 5.00% |
| Fidelity TDFs | 5.72% | 4.46% |
| State Street TDFs | 6.00% | |
| T. Rowe Price TDFs | 6.10% | 4.77% |
| TIAA-CREF TDFs | 5.76% | 4.70% |
| Fluor TDFs | 5.10% | 3.80% |
| **Fluor Rank** | **Last** | **Last** |

| Returns as of 4Q2018 | | |
|---|---|---|
| **2040 Fund** | **3-Year** | **5-Year** |
| American TDFs | 7.62% | 6.05% |
| Fidelity TDFs | 6.97% | 5.14% |
| State Street TDFs | 6.73% | |
| T. Rowe Price TDFs | 6.77% | 5.30% |
| TIAA-CREF TDFs | 7.11% | 5.45% |
| Fluor TDFs | 6.30% | 4.60% |
| **Fluor Rank** | **Last** | **Last** |

| Returns as of 4Q2018 | | |
|---|---|---|
| **2055 Fund** | **3-Year** | **5-Year** |
| American TDFs | 7.81% | 6.17% |
| Fidelity TDFs | 6.98% | 5.13% |
| State Street TDFs | 6.93% | |
| T. Rowe Price TDFs | 6.78% | 5.31% |
| TIAA-CREF TDFs | 7.44% | 5.64% |
| Fluor TDFs | 6.50% | 4.70% |
| **Fluor Rank** | **Last** | **Last** |

| Returns as of 4Q2019 | | |
|---|---|---|
| **2025 Fund** | **3-Year** | **5-Year** |
| American TDFs | 9.47% | 7.12% |
| Fidelity TDFs | 9.58% | 6.97% |
| State Street TDFs | 9.97% | 7.13% |
| T. Rowe Price TDFs | 10.34% | 7.60% |
| TIAA-CREF TDFs | 9.66% | 7.13% |
| Fluor TDFs | 8.60% | 6.20% |
| **Fluor Rank** | **Last** | **Last** |

| Returns as of 4Q2019 | | |
|---|---|---|
| **2040 Fund** | **3-Year** | **5-Year** |
| American TDFs | 12.76% | 9.30% |
| Fidelity TDFs | 12.15% | 8.73% |
| State Street TDFs | 11.64% | 8.19% |
| T. Rowe Price TDFs | 12.14% | 8.74% |
| TIAA-CREF TDFs | 11.96% | 8.73% |
| Fluor TDFs | 11.30% | 8.00% |
| **Fluor Rank** | **Last** | **Last** |

| Returns as of 4Q2019 | | |
|---|---|---|
| **2055 Fund** | **3-Year** | **5-Year** |
| American TDFs | 13.11% | 9.54% |
| Fidelity TDFs | 12.13% | 8.71% |
| State Street TDFs | 12.04% | 8.38% |
| T. Rowe Price TDFs | 12.32% | 8.86% |
| TIAA-CREF TDFs | 12.62% | 9.24% |
| Fluor TDFs | 12.00% | 8.40% |
| **Fluor Rank** | **Last** | **5/6** |

| Returns as of 2Q2020 | | |
|---|---|---|
| **2025 Fund** | **3-Year** | **5-Year** |
| American TDFs | 7.04% | 6.89% |
| Fidelity TDFs | 6.82% | 6.42% |
| State Street TDFs | 6.97% | 6.70% |
| T. Rowe Price TDFs | 6.21% | 6.48% |
| TIAA-CREF TDFs | 6.81% | 6.59% |
| Fluor TDFs | 6.00% | 5.70% |
| **Fluor Rank** | **Last** | **Last** |

| Returns as of 2Q2020 | | |
|---|---|---|
| **2040 Fund** | **3-Year** | **5-Year** |
| American TDFs | 8.38% | 8.24% |
| Fidelity TDFs | 7.09% | 7.20% |
| State Street TDFs | 7.58% | 7.39% |
| T. Rowe Price TDFs | 6.63% | 7.08% |
| TIAA-CREF TDFs | 7.32% | 7.41% |
| Fluor TDFs | 6.10% | 6.30% |
| **Fluor Rank** | **Last** | **Last** |

| Returns as of 2Q2020 | | |
|---|---|---|
| **2055 Fund** | **3-Year** | **5-Year** |
| American TDFs | 8.62% | 8.47% |
| Fidelity TDFs | 7.09% | 7.20% |
| State Street TDFs | 7.40% | 7.38% |
| T. Rowe Price TDFs | 6.54% | 7.08% |
| TIAA-CREF TDFs | 7.30% | 7.64% |
| Fluor TDFs | 6.00% | 6.40% |
| **Fluor Rank** | **Last** | **Last** |

36.     The dramatic underperformance of the Fluor TDFs compared to its peers among the Off-the-Shelf TDFs is not limited to the above few points during the Class Period for which Plaintiffs has Fluor TDF performance data from participant disclosures.[7]  Indeed, the performance of the Fluor TDFs persistently and dramatically trailed the performance of the Off-the-Shelf TDFs at *every quarter end* in the Class Period.[8]  At any point in the Class Period, such

---

[7] The returns and composition of the Fluor TDFs closely track those of the BlackRock TDFs. The trailing returns of the two suites never differ by more than 5 basis points (0.05%), a small discrepancy that cannot compensate for the dramatic gap between the performance of the Fluor TDFs and the Off-the-Shelf TDFs.  Indeed, participant disclosures and fund fact sheets available to Plaintiffs refer to the Fluor TDFs as BlackRock Life Path Index Funds. Accordingly, Plaintiffs here cites to the performance data of the BlackRock TDFs as a proxy for the corresponding Fluor TDF data to which he does not have access.

[8] Investment professionals and prudent fiduciaries recognize the necessity of regularly evaluating the performance of investments on at least a quarterly basis.

data would have been sufficient to convince a fiduciary following a prudent process that the

Fluor TDFs should be removed:

- At the end of the First Quarter of 2016 (the first quarter of the Class Period), the Black Rock 2040 TDF's three-year return of 5.15% trailed those of the Off-the-Shelf TDFs, which ranged from 5.80% to 8.44%. Similarly, the BlackRock 2040 TDF's five-year return of 5.30% trailed those of the Off-the-Shelf TDFs, which ranged from 5.76% to 8.41%.

- At the end of the Second Quarter of 2016, the Black Rock 2040 TDF's three-year return of 6.19% trailed those of the Off-the-Shelf TDFs, which ranged from 6.73% to 8.61%. Similarly, the BlackRock 2040 TDF's five-year return of 6.11% trailed those of the Off-the-Shelf TDFs, which ranged from 6.22% to 8.73%.

- At the end of the Third Quarter of 2016, the Black Rock 2040 TDF's three-year return of 5.72% trailed those of the Off-the-Shelf TDFs, which ranged from 6.36% to 7.70%. Similarly, the BlackRock 2040 TDF's five-year return of 9.02% trailed those of the Off-the-Shelf TDFs, which ranged from 10.22% to 13.07%.

- At the end of the Fourth Quarter of 2016, the Black Rock 2040 TDF's three-year return of 4.14% trailed those of the Off-the-Shelf TDFs, which ranged from 4.61% to 5.19%. Similarly, the BlackRock 2040 TDF's five-year return of 8.18% trailed those of the Off-the-Shelf TDFs, which ranged from 9.00% to 11.46%.

- At the end of the First Quarter of 2017, the Black Rock 2040 TDF's three-year return of 5.24% trailed those of the Off-the-Shelf TDFs, which ranged from 6.17% to 6.84%. Similarly, the BlackRock 2040 TDF's five-year return of 7.18% trailed those of the Off-the-Shelf TDFs, which ranged from 8.32% to 10.59%.

- At the end of the Second Quarter of 2017, the Black Rock 2040 TDF's three-year return of 4.93% trailed those of the Off-the-Shelf TDFs, which ranged from 5.81% to 6.69%. Similarly, the BlackRock 2040 TDF's five-year return of 8.84% trailed those of the Off-the-Shelf TDFs, which ranged from 9.81% to 12.07%.

- At the end of the Third Quarter of 2017, the Black Rock 2040 TDF's three-year return of 7.15% trailed those of the Off-the-Shelf TDFs, which ranged from 7.74% to 8.85%. Similarly, the BlackRock 2040 TDF's five-year return of 8.71% trailed those of the Off-the-Shelf TDFs, which ranged from 9.53% to 11.90%.

- At the end of the Fourth Quarter of 2017, the Black Rock 2040 TDF's three-year return of 8.34% trailed those of the Off-the-Shelf TDFs, which ranged from

8.75% to 9.89%.  Similarly, the BlackRock 2040 TDF's five-year return of 9.09% trailed those of the Off-the-Shelf TDFs, which ranged from 10.44% to 12.45%.

- At the end of the First Quarter of 2018, the Black Rock 2040 TDF's three-year return of 7.05% trailed those of the Off-the-Shelf TDFs, which ranged from 7.46% to 9.20%.  Similarly, the BlackRock 2040 TDF's five-year return of 8.01% trailed those of the Off-the-Shelf TDFs, which ranged from 9.00% to 10.51%.

- At the end of the Second Quarter of 2018, the Black Rock 2040 TDF's three-year return of 7.70% trailed those of the Off-the-Shelf TDFs, which ranged from 8.12% to 9.56%.  Similarly, the BlackRock 2040 TDF's five-year return of 8.48% trailed those of the Off-the-Shelf TDFs, which ranged from 9.47% to 10.91%.

- At the end of the Third Quarter of 2018, the Black Rock 2040 TDF's three-year return of 11.77% trailed those of the Off-the-Shelf TDFs, which ranged from 12.25% to 13.45%.  Similarly, the BlackRock 2040 TDF's five-year return of 8.02% trailed those of the Off-the-Shelf TDFs, which ranged from 9.22% to 10.08%.

- At the end of the Fourth Quarter of 2018, the Black Rock 2040 TDF's three-year return of 6.35% trailed those of the Off-the-Shelf TDFs, which ranged from 6.73% to 7.62%.  Similarly, the BlackRock 2040 TDF's five-year return of 4.54% trailed those of the Off-the-Shelf TDFs, which ranged from 5.14% to 6.05%.

- At the end of the First Quarter of 2019, the Black Rock 2040 TDF's three-year return of 9.73% trailed those of the Off-the-Shelf TDFs, which ranged from 10.14% to 11.28%.  Similarly, the BlackRock 2040 TDF's five-year return of 6.41% trailed those of the Off-the-Shelf TDFs, which ranged from 7.19% to 7.98%.

- At the end of the Second Quarter of 2019, the Black Rock 2040 TDF's three-year return of 10.09% trailed those of the Off-the-Shelf TDFs, which ranged from 10.68% to 11.69%.  Similarly, the BlackRock 2040 TDF's five-year return of 6.18% trailed those of the Off-the-Shelf TDFs, which ranged from 7.03% to 7.74%.

- At the end of the Third Quarter of 2019, the Black Rock 2040 TDF's three-year return of 8.82% trailed those of the Off-the-Shelf TDFs, which ranged from 9.30% to 9.93%.  Similarly, the BlackRock 2040 TDF's five-year return of 6.75% trailed those of the Off-the-Shelf TDFs, which ranged from 7.21% to 7.95%.

- At the end of the Fourth Quarter of 2019, the Black Rock 2040 TDF's three-year return of 11.29% trailed those of the Off-the-Shelf TDFs, which ranged from 11.64% to 12.76%. Similarly, the BlackRock 2040 TDF's five-year return of 8.00% trailed those of the Off-the-Shelf TDFs, which ranged from 8.19% to 9.30%.

- At the end of the First Quarter of 2020, the Black Rock 2040 TDF's three-year return of 1.71% trailed those of the Off-the-Shelf TDFs, which ranged from 2.03% to 3.77%. Similarly, the BlackRock 2040 TDF's five-year return of 2.88% trailed those of the Off-the-Shelf TDFs, which ranged from 3.42% to 4.81%.

- At the end of the Second Quarter of 2020, the Black Rock 2040 TDF's three-year return of 6.02% trailed those of the Off-the-Shelf TDFs, which ranged from 6.63% to 8.38%. Similarly, the BlackRock 2040 TDF's five-year return of 6.26% trailed those of the Off-the-Shelf TDFs, which ranged from 7.08% to 8.24%.

- At the end of the Third Quarter of 2020, the Black Rock 2040 TDF's three-year return of 6.96% trailed those of the Off-the-Shelf TDFs, which ranged from 7.52% to 9.05%. Similarly, the BlackRock 2040 TDF's five-year return of 9.44% trailed those of the Off-the-Shelf TDFs, which ranged from 10.42% to 11.34%.

- At the end of the Fourth Quarter of 2020, the Black Rock 2040 TDF's three-year return of 9.64% trailed those of the Off-the-Shelf TDFs, which ranged from 10.68% to 11.76%. Similarly, the BlackRock 2040 TDF's five-year return of 11.34% trailed those of the Off-the-Shelf TDFs, which ranged from 12.21% to 12.99%.

- At the end of the First Quarter of 2021, the Black Rock 2040 TDF's three-year return of 11.52% trailed those of the Off-the-Shelf TDFs, which ranged from 12.24% to 13.07%. Similarly, the BlackRock 2040 TDF's five-year return of 11.88% trailed those of the Off-the-Shelf TDFs, which ranged from 12.78% to 13.75%.

- At the end of the Second Quarter of 2021, the Black Rock 2040 TDF's three-year return of 13.35% trailed those of the Off-the-Shelf TDFs, which ranged from 13.99% to 14.80%. Similarly, the BlackRock 2040 TDF's five-year return of 12.82% trailed those of the Off-the-Shelf TDFs, which ranged from 13.66% to 14.69%.

- At the end of the Third Quarter of 2021, the Black Rock 2040 TDF's three-year return of 11.87% trailed those of the Off-the-Shelf TDFs, which ranged from 12.04% to 13.49%. Similarly, the BlackRock 2040 TDF's five-year return of

11.75% trailed those of the Off-the-Shelf TDFs, which ranged from 12.37% to 13.52%.

- At the end of the Fourth Quarter of 2021, the Black Rock 2040 TDF's three-year return of 18.16% trailed those of the Off-the-Shelf TDFs, which ranged from 18.48% to 19.96%.  Similarly, the BlackRock 2040 TDF's five-year return of 12.77% trailed those of the Off-the-Shelf TDFs, which ranged from 13.34% to 14.75%.

37.     Again, Defendants had immediate access to historical and then-current returns data for the Fluor TDFs, and could have sought comparative data at any time from Aon Hewitt/Voya and/or Mercer, or obtained it themselves in real time through just a few clicks of a computer mouse.

38.     Across the board, at all stages along the Fluor TDFs' glide path[9] from aggressive to conservative, the Fluor TDFs' returns pale in comparison to those of the Off-the-Shelf TDFs. Defendants, however, neglected to undertake any analysis of the Active suite against appropriate peers using the above important performance metrics.  If Defendants had taken their fiduciary duties seriously throughout the Class Period they would have replaced the Fluor TDFs with one of the Off-the-Shelf TDFs, or indeed one of the several other superior, available alternative TDF suites.  Their failure to do so caused Plan participants to miss out on millions in capital appreciation for their retirement savings.

ii.     <u>The Custom Large Cap Equity Fund</u>

39.     It is a basic principle of investment theory that the risks associated with an investment must first be justified by its potential returns for that investment to be rational.  This principle applies even before considering the purpose of the investment and the needs of the investor, such as the retirement assets here.  The Capital Asset Pricing Model ("CAPM"), which

---

[9]A TDF's shifting allocations to stocks, bonds and cash over time as investors approach their target retirement date is referred to as its glide path.

is used for pricing securities and generating expected returns for assets given the risk of those

assets and the cost of capital, provides a mathematical formula distilling this principle:

$ERi=Rf+\beta i(ERm-Rf)$, where:

$ERi$=expected return of investment
$Rf$=risk-free rate
$\beta i$=beta of the investment
$(ERm-Rf)$=market risk premium

40.     Applied here and put simply, the $\beta i$ is the risk associated with an actively-

managed mutual fund, which can only be justified if the $ERi$ of the investment option is, at the

very least, above that of its benchmark, $Rf$.[10]  Otherwise, the model collapses, and it would be

imprudent to assume any risk without achieving an associated return above the benchmark

returns.

41.     The Large Cap Equity Fund is a custom investment alternative established for

exclusive use by the plans in the Master Trust, including the Plan.  The Fund has failed to

demonstrate an ability to beat its benchmark, the Russell 1000 Index, over a trailing five- or ten-

year period, per the data points available to Plaintiffs through Plan literature:

| Large Cap Equity Fund Outperformance v Benchmark | | | | | | |
|---|---|---|---|---|---|---|
| | 5-Year Annualized Returns | | | 10-Year Annualized Returns | | |
| As of | Fund | Benchmark | Diff | Fund | Benchmark | Diff |
| 4Q2018 | 7.1% | 8.2% | -1.1% | 12.7% | 13.3% | -0.6% |
| 4Q2019 | 10.6% | 11.5% | -0.9% | 12.5% | 13.5% | -1.0% |
| 2Q2020 | 8.4% | 10.5% | -2.1% | 12.4% | 14.0% | -1.6% |

42.     As discussed above, active managers face an uphill battle to provide value by

consistently beating their benchmarks with the additional obstacle of high fees, compared to

those funds that simply track the benchmark.  Given the presence in the Plan lineup of an index

fund that already tracks the large cap domestic market (the S&P 500 Index Fund), there was and

---

[10]In this instance, the index benchmark takes the place of the "risk-free" rate, as the investment option is measured against the performance of that investment category, rather than the typical U.S. Treasury Bonds or equivalent government security in a general CAPM calculation.

is no reason to include an actively managed fund in the U.S. large cap space, particularly not one so poor. Indeed, Morningstar concluded in its year-end 2018 report on active vs passive management that long term success rates (a fund's ability to survive and outperform a low-cost index fund tracking its benchmark over longer time horizons) were lowest among U.S. large cap funds. Defendants' misguided decision to create and retain the Fund, an actively managed U.S. large cap, was exacerbated by the Fund's complete inability to provide participants sufficient value to justify its 30 basis point (0.30%) expense ratio. In contrast, the Plan's index option that tracks the S&P 500 Index charges a measly 5 basis points (0.05%). Indeed, it was a severe breach of fiduciary duty for Defendants to retain an investment option that, for six times the cost of an alternative fund in the same category, failed to produce returns to match, much less exceed, the alternative.

iii.   The Custom Small/Mid Cap Equity Fund

43.   The Small/Mid Cap Equity Fund is a custom investment alternative established for exclusive use by the plans in the Master Trust, including the Plan. The Fund suffers from the same performance failures as the custom Large Cap Equity Fund; it has failed to demonstrate an ability to beat its benchmark, the Russell 2500 Index, over a trailing five- or ten-year period, per the data points available to Plaintiffs through Plan literature:

| Small/Mid Cap Equity Fund Outperformance v Benchmark | | | | | | |
|---|---|---|---|---|---|---|
| | 5-Year Annualized Returns | | | 10-Year Annualized Returns | | |
| As of | Fund | Benchmark | Diff | Fund | Benchmark | Diff |
| 4Q2018 | 3.8% | 5.1% | -1.3% | 12.6% | 13.2% | -0.6% |
| 4Q2019 | 8.6% | 8.9% | -0.3% | 11.4% | 12.6% | -1.2% |
| 2Q2020 | 3.8% | 5.4% | -1.6% | 9.5% | 11.5% | -2.0% |

44.   Again, active managers face an uphill battle to provide value by consistently beating their benchmarks with the additional obstacle of high fees, compared to those funds that simply track the benchmark. Given the presence in the Plan lineup of an index fund that already

tracks the small/mid cap domestic market (the Small/Mid Cap Equity Index Fund[11]), there was and is no reason to include an actively managed fund in the U.S. small/mid cap space, particularly not one so poor. Defendants' misguided decision to create and retain the Fund was exacerbated by the Fund's complete inability to provide participants sufficient value to justify its 46 basis point (0.46%) expense ratio. In contrast, the Plan's index option charges just 6 basis points (0.06%). Indeed, it was a severe breach of fiduciary duty for Defendants to retain an investment option that, for nearly eight times the cost of an alternative fund in the same category, failed to produce returns to match, much less exceed, the alternative.

iv.   <u>The Custom Non-U.S. Equity Fund</u>

45.   The Non-U.S. Equity Fund is a custom investment alternative established for exclusive use by the plans in the Master Trust, including the Plan. The Fund has also repeatedly failed to beat its benchmark, the MSCI ACWI ex U.S. Index, over a trailing five- or ten-year period, per the data points available to Plaintiffs through Plan literature:

| Non-US Equity Fund Outperformance v Benchmark | | | | | | |
|---|---|---|---|---|---|---|
| | 5-Year Annualized Returns | | | 10-Year Annualized Returns | | |
| As of | Fund | Benchmark | Diff | Fund | Benchmark | Diff |
| 4Q2018 | -0.2% | 0.7% | -0.9% | 4.6% | 6.6% | -2.0% |
| 4Q2019 | 5.2% | 5.5% | -0.3% | 3.7% | 5.0% | -1.3% |
| 2Q2020 | 1.4% | 2.3% | -0.9% | 4.1% | 5.0% | -0.9% |

46.   As demonstrated above, the active managers Defendants selected for the plan have failed to provide value by consistently beating their benchmarks with the additional obstacle of high fees. The Plan lineup includes an index fund that already tracks the MSCI ACWI ex U.S. Index (the Non-U.S. Equity Index Fund). Accordingly, there was and is no reason to include the actively managed Non-U.S. Equity Fund that has shown zero ability to provide participants sufficient value to justify its 39 basis point (0.39%) expense ratio. In

---

[11]The Small/Mid Cap Equity Index Fund tracks the Dow Jones U.S. Completion Total Stock Market Index, which, according to the Fund's fact sheet, represents the small and mid-cap segments of the U.S. market.

contrast, the Plan's index option charges just 11 basis points (0.11%). Indeed, it was a severe breach of fiduciary duty for Defendants to retain an investment option that, for nearly four times the cost of an alternative fund in the same category, failed to produce returns to match, much less exceed, the alternative.

### 2. Mercer Breached its Fiduciary Duty to the Plan by Failing to Replace the Challenged Investments

47.     When Mercer became the Plan's designated fiduciary investment adviser, the Fluor TDFs, the Custom Large Cap Equity Fund, the Custom Small/Mid Cap Equity Fund and the Custom Non-U.S. Equity Fund (the "Challenged Funds" or "Challenged Investments") all had existed as investments in the Plan for a number of years and each of the Challenged Funds had an established history of underperformance as of 2017 – which information was readily available to Mercer.[12]  For example, the Fluor TDFs had existed in the Plan as investment options since at least 2010 and the other Challenged Funds were investment options in the Plan as of 2014 or earlier.

48.     Mercer, like virtually all other investment advisers, maintains internal rankings of so-called "best in class" investment options so that it is able to recommend replacement, substitution or addition of investment options in defined contribution plans in circumstances

---

[12]As indicated above, the Fluor TDFs and their Blackrock LifePath series of TDFs have a significant and well documented history of poor performance that dates back to the very beginning of the Class Period (and even beforehand).  The other Challenged Funds are opaque custom investments with multiple investment managers that all are constructed and designed in the same manner.  These Challenged Funds (the Custom Large Cap Equity Fund, the Custom Small/Mid Cap Equity Fund and the Custom Non-U.S. Equity Fund), as a matter of investment design, effectively incur multiple layers of unnecessary investment management fees because they strangely employ the services of multiple managers to pursue a single investment strategy or mandate.  In light of this approach, it is little wonder that the information available to Plaintiffs reflects a history of persistence underperformance by these Challenged Funds that appears to date back to at least 2014 and likely beforehand, based upon the five (5) and ten (10) year performance data available to Plaintiffs.  Since these Challenged Funds, unlike the Fluor TDFs, do not have a readily available marketplace counterpart and the Plan does not provide three (3) year performance data for these funds, it is difficult for Plaintiffs to fully estimate the full scope of these Challenged Funds underperformance.  The available data, however, clearly indicates that these Challenged Funds (like the Fluor TDFs) should have been eliminated from the Plan at or before the beginning of the Class Period (*i.e.*, in 2016) and most certainly should have been eliminated when Mercer undertook its duties as the discretionary investment advisor for the Plan.

where it determines that such action is warranted and/or so that it can take action to replace, substitute for or add investment options itself in circumstances where, as here, it functions as an ERISA 3(38) investment adviser and has the discretion and duty to make such decisions for the Plan.  As a practice, Mercer does not publish this analysis or share such analysis with its clients, such as Defendants, and, instead, Mercer effectively conceals the existence of these "best in class" investment options from its clients, including Defendants and the Plan.  Although the BlackRock TDFs have historically been rated well in terms of "people, process and parent" (the qualitative factors applied by organizations such as Morningstar), they never have been rated highly based upon quantitative analysis – the factor that Mercer knows (and Defendants should have known) is the most important consideration when choosing an all-in-one retirement solution (such as the Fluor TDFs) or other investment options (such as the other Challenged Investments), which have readily available counterparts offered in the marketplace by other reputable companies.  Indeed, when recommending TDFs to its clients and/or choosing TDFs for other plans that did not contain BlackRock TDFs like the Fluor TDFs, upon information and belief, Mercer recommended or chose other better performing target date funds for its clients.  But, in light of its business relationship with BlackRock, as described below, it appears that Mercer either breached its fiduciary duty by failing to eliminate the Fluor TDFs from the Plan once it gained its position as a discretionary investment adviser because eliminating such BlackRock TDFs from the large Plan would conflict with its business relationship with BlackRock or otherwise breached its duty by failing to engage in any significant or meaningful evaluation of the most important investments in the Plan – that is the Fluor TDFs.[13]

---

[13]The fact that Mercer also continued to allow the Managed Account to be offered to the Plan's participants further supports the inference that Mercer was derelict in its duties.  The Managed Account product offered by Voya is nothing more than an extremely expensive, canned product that (1) layers expenses onto the expense ratios of the investments offered in the Plan, and (2) is significantly more expensive version (by approximately 15 basis points on average) of similar products offered by other recordkeepers like Voya. While Voya derives significant compensation from this product of highly questionable efficacy and prudence, the Plan and its participants receive little or no benefit since, for virtually all Plan participants,

49.     Mercer and its affiliates also have conducted and/or have access to research confirming that, when investments have a history of poor performance (like the Challenged Investments here), they are statistically unlikely to improve in the future and, therefore, should be promptly replaced once they have an establish history of underperformance.  Virtually all investment advisers, including Mercer, focus on performance over a three (3) and five (5) year period in recognition of the fact that, if an investment underperforms over such periods approximating a market cycle, it is unlikely to improve and should be promptly replaced. Likewise, virtually all competent investment policy statements for defined contribution plans focus on three (3) and five (5) year past performance as the key metrics to evaluate to determine whether investments should be maintained in a plan.

50.     Based upon the historic and continued poor performance of the Challenged Investments, it is inconceivable that Mercer did not recognize that the Plan was offering investments (the Challenged Funds) that should have been replaced when they became the Plan's ERISA 3(38) investment adviser in 2017 and obtained discretion to replace these investments. Likewise, if Defendants had fulfilled their fiduciary duties prior to 2017 (when they were directly responsible for choosing and monitoring the investments offered within the Plan), all of the Challenged Funds would have been replaced by no later than 2016, given their persistent history of underperformance.  Finally, if Defendants had monitored Mercer's performance with the required degree of diligence and provided the oversight of Mercer required by their fiduciary positions and duties, they would have engaged in a searching examination of Mercer's performance, including questioning Mercer about why it was allowing the Challenged Funds to be maintained in the Plan, whether Mercer had any conflicts of interest with respect to the

---

the Managed Account functions as an expensive and unnecessary version of a target date fund, which provides the illusion of customization while the product actually offers little meaningful differentiation between participants.  Any competent investment adviser would have recommended elimination of the Managed Account when retained or substantial negotiation down of the fees.  The fact that Mercer did neither speaks volumes about the manner in which it approached its fiduciary duties to the Plan.

Challenged Funds and if Mercer was aware of any investments that would be better alternatives for the Plan and its participants.  Based upon the persistent underperformance of the Challenged Funds and the stale nature of the investment lineup in the Plan, it is apparent that Defendants engaged in no significant or serious monitoring of Mercer and its performance.

51.     The reason for Mercer's failure to replace the poor performing Fluor TDFs appears to be borne from a conflict of interest.  At all pertinent times, Mercer has been an investment adviser for BlackRock's own retirement plans.  Indeed, during the Class Period (in 2018), Mercer's actions in allegedly rubber-stamping the inclusion of BlackRock investments within BlackRock retirement plans was specifically challenged and the prudence of inclusion of BlackRock TDFs in those BlackRock retirement plans also were challenged.  At a minimum, that lawsuit should have triggered a full examination by Mercer as to the prudence of the Fluor TDFs, as well as the other Challenged Investments, and a review by the other Defendants of Mercer's conduct as the Plan's fiduciary investment adviser.  Any such review would have resulted in elimination of the Challenged Funds and substitution with better performing, prudent investment alternatives.  The fact that no such replacement occurred counsels strongly for the inference that no meaningful review of the Plan's investments ever occurred and no meaningful monitoring of Mercer was performed by the other Defendants.

52.     The Plan and thereby its participants paid Mercer compensation as an investment adviser through the Master Trust of $529,000 in 2017, $1,150,000 in 2018, $926,000 in 2019 and $891,000 in 2020.[14]  Since Mercer delivered no significant value to the Plan and actually harmed the Plan and its participants through its investment decisions (or lack thereof), the investment

---

[14]The amount the Plan paid in 2021 to Mercer is not currently available because the Plan has yet to file its Form 5500 with the Department of Labor.  In addition, although the above fees paid to Mercer were not entirely paid by the Plan and its participants, it is clear that the vast majority of these fees were paid by the Plan and its participants because the Plan's assets account for approximately 99% of the Master Trust's assets.

management fees paid to Mercer were excessive, harmed each participant in the Plan and should be disgorged or remitted by Mercer to the Plan and its participants.

## V.    ERISA'S FIDUCIARY STANDARDS

53.    ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendants as fiduciaries of the Plan.  Section 404(a) of ERISA, 29 U.S.C. § 1104(a), states, in relevant part, as follows:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and -
>
> (A)    for the exclusive purpose of
>
> > (i)    providing benefits to participants and their beneficiaries; and
> > (ii)    defraying reasonable expenses of administering the plan;
>
> > [and]
>
> (B)    with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

54.    Under 29 U.S.C. § 1103(c)(l), with certain exceptions not relevant here, the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in a plan and their beneficiaries and defraying reasonable expenses of administering the plan.

55.    Under ERISA, parties that exercise any authority or control over plan assets, including the selection of plan investments and service providers, are fiduciaries and must act prudently and solely in the interest of participants in a plan.

56.    ERISA's fiduciary duties are "the highest known to the law" and must be performed "with an eye single" to the interests of participants.  *Donovan v. Bierwirth*, 680 F.2d 263, 271, 272 n. 8 (2d Cir. 1982).

57.     ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries.  Section 405(a) of ERISA, 29 U.S.C. § 1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty.  ERISA states, in relevant part, as follows:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> > (1)     if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or
> >
> > (2)     if, by his failure to comply with section 404(a)(l) in the administration of his specific responsibilities which give risk to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
> >
> > (3)     if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

58.     Section 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under Section 409, 29 U.S.C. § 1109.  Section 409(a) of ERISA provides, in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

## VI.     CLASS ALLEGATIONS

59.     This action is brought as a class action by Plaintiffs on behalf of themselves and the following proposed class (the "Class"):

> All participants and beneficiaries in the Fluor Corporation Employees' Savings Investment Plan (the "Plan") at any time on or after January 24, 2022 to the date of judgment or such other earlier date that the Court

determines is appropriate and just (the "Class Period"), including any beneficiary of a deceased person who was a participant in the Plan at any time during the Class Period.

Excluded from the Class are Defendants and the Judge to whom this case is assigned or any other judicial officer having responsibility for this case who is a beneficiary.

60.     This action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

61.     **Numerosity**.  Plaintiffs are informed and believe that there are at least thousands of Class members throughout the United States.  As a result, the members of the Class are so numerous that their individual joinder in this action is impracticable.

62.     **Commonality**.  There are numerous questions of fact and/or law that are common to Plaintiffs and all the members of the Class, including, but not limited to the following:

(a)     Whether Defendants failed and continue to fail to discharge their duties with respect to the Plan solely in the interest of the Plan's participants for the exclusive purpose of providing benefits to participants and their beneficiaries;

(b)     Whether Defendants breached their fiduciary duties under ERISA by failing to defray the reasonable expenses of administering the Plan; and

(c)     Whether and what form of relief should be afforded to Plaintiffs and the Class.

63.     **Typicality**.  Plaintiffs, who are members of the Class, have claims that are typical of all of the members of the Class.  Plaintiffs' claims and all of the Class members' claims arise out of the same uniform course of conduct by Defendants and arise under the same legal theories that are applicable as to all other members of the Class.  In addition, Plaintiffs seek relief for the Plan under the same remedial theories that are applicable as to all other members of the Class.

64.     **Adequacy of Representation**.  Plaintiffs will fairly and adequately represent the interests of the members of the Class.  Plaintiffs have no conflicts of interest with or interests

that are any different from the other members of the Class.  Plaintiffs have retained competent

counsel experienced in class action and other complex litigation, including class actions under

ERISA.

65.    **Potential Risks and Effects of Separate Actions**.  The prosecution of separate

actions by or against individual Class members would create a risk of: (A) inconsistent or varying

adjudications with respect to individual class members that would establish incompatible standards

of conduct for the party opposing the Class; or (B) adjudications with respect to individual Class

members that, as a practical matter, would be dispositive of the interests of the other members not

parties to the individual adjudications or would substantially impair or impede their ability to

protect their interests.

66.    **Predominance**.  Common questions of law and fact predominate over questions

affecting only individual Class members, and the Court, as well as the parties, will spend the

vast majority of their time working to resolve these common issues.  Indeed, virtually the only

individual issues of significance will be the exact amount of damages recovered by each Class

member, the calculation of which will ultimately be a ministerial function and which does not

bar Class certification.

67.    **Superiority**.  A class action is superior to all other feasible alternatives for the

resolution of this matter.  The vast majority of, if not all, Class members are unaware of

Defendants' breaches of fiduciary duty and prohibited transactions such that they will never

bring suit individually.  Furthermore, even if they were aware of the claims they have against

Defendants, the claims of virtually all Class members would be too small to economically

justify individual litigation.  Finally, individual litigation of multiple cases would be highly

inefficient, a gross waste of the resources of the courts and of the parties, and potentially could

lead to inconsistent results that would be contrary to the interests of justice.

68.     **<u>Manageability</u>**.  This case is well-suited for treatment as a class action and easily can be managed as a class action since evidence of both liability and damages can be adduced, and proof of liability and damages can be presented, on a Class-wide basis, while the allocation and distribution of damages to Class members would be essentially a ministerial function.

69.     Defendants have acted on grounds generally applicable to the Class by uniformly subjecting them to the breaches of fiduciary duty described above.  Accordingly, injunctive relief, as well as legal and/or equitable monetary relief (such as disgorgement and/or restitution), along with corresponding declaratory relief, are appropriate with respect to the Class as a whole.

70.     Plaintiffs' counsel will fairly and adequately represent the interests of the Class and are best able to represent the interests of the Class under Rule 23(g) of the Federal Rules of Civil Procedure.  Moreover, treating this case as a class action is superior to proceeding on an individual basis and there will be no difficulty in managing this case as a class action.

71.     Therefore, this action should be certified as a class action under Rules 23(a) and 23(b)(1) and/or 23(b)(3) of the Federal Rules of Civil Procedure.

<u>**COUNT I**</u>
**(For Breach of Fiduciary Duty)**

72.     Plaintiffs incorporate by reference the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

73.     Defendants' conduct, as set forth above, violates their fiduciary duties under Sections 404(a)(1)(A), (B) and (D) of ERISA, 29 U.S.C. § 1104(a)(1)(A), (B) and (D), in that Defendants failed and continue to fail to discharge their duties with respect to the Plan solely in the interest of the Plan's participants and beneficiaries and (a) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the Plan with (b) the care, skill, prudence, and diligence under the

circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, and (c) by failing to act in accordance with the documents and instruments governing the Plan.  In addition, as set forth above, Defendants violated their respective fiduciary duties under ERISA to monitor other fiduciaries of the Plan in the performance of their duties.

74.     To the extent that any of the Defendants did not directly commit any of the foregoing breaches of fiduciary duty, at the very minimum, each such Defendant is liable under 29 U.S.C. § 1105(a) because he, she, they or it was a co-fiduciary and knowingly participated in (or concealed) a breach by another fiduciary, enabled another fiduciary to commit breaches of fiduciary duty in the administration of his, her, their or its specific responsibilities giving rise to his, her, their or its fiduciary status and/or knowingly failing to cure a breach of fiduciary duty by another fiduciary and/or failed to take reasonable efforts to remedy the breach.

75.     As a direct result of Defendants' breaches of duties, the Plan has suffered losses and damages.

76.     Pursuant to Sections 409 and 502(a)(2) of ERISA, 29 U.S.C. §§ 1109 and 1132, Defendants are liable to restore to the Plan the losses that have been suffered as a direct result of Defendants' breaches of fiduciary duty and are liable for damages and any other available equitable or remedial relief, including prospective injunctive and declaratory relief, and attorneys' fees, costs and other recoverable expenses of litigation.

## COUNT II
### (Failure to Monitor Fiduciaries and Co-Fiduciary Breaches)

77.     Plaintiffs incorporate the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

78.     Fluor is responsible for appointing, overseeing, and removing members of the Committees, who, in turn, are responsible for appointing, overseeing, and removing members of

the Committees.

79.     In light of its appointment and supervisory authority, Fluor had a fiduciary responsibility to monitor the performance of the Committees and their members.  In addition, Fluor and the Committees had a fiduciary responsibility to monitor the performance of the members of the respective Committees.

80.     A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of Plan assets, and must take prompt and effective action to protect the Plan and participants when they are not.

81.     To the extent that fiduciary monitoring responsibilities of Fluor or the Committees was delegated, each Defendant's monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently and loyally.

82.     Fluor and the Committees breached their fiduciary monitoring duties by, among other things:

(a)  Failing to monitor and evaluate the performance of its appointees or have a system in place for doing so, standing idly by as the Plan suffered enormous losses as a result of the appointees' imprudent actions and omissions with respect to the Plan;

(b)  Failing to monitor its appointees' fiduciary processes, which would have alerted a prudent fiduciary to the breaches of fiduciary duties described herein, in clear violation of ERISA; and

(c)  Failing to remove appointees whose performances were inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, all to the detriment of the Plan and its participants' retirement savings.

83.     As a consequence of these breaches of the fiduciary duty to monitor, the Plan suffered substantial losses.  Had Fluor and the Committees discharged their fiduciary monitoring

duties prudently as described above, the losses suffered by the Plan would have been minimized or avoided.  Therefore, as a direct result of the breaches of fiduciary duties alleged herein, the Plan and its participants have lost millions of dollars of retirement savings.

84.     Fluor and the Committees are liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count, to restore to the Plan any profits made through use of Plan assets, and are subject to other equitable or remedial relief as appropriate.

85.     Each of the Defendants also knowingly participated in the breaches of the other Defendants, knowing that such acts were constituted breaches; enabled the other Defendants to commit breaches by failing to lawfully discharge their own fiduciary duties; and knew of the breaches by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breaches.  Defendants, thus, are liable for the losses caused by the breaches of their co-fiduciaries under 29 U.S.C. § 1105(a).

## COUNT III
### (In the Alternative, Liability for Knowing Breach of Trust)

86.     Plaintiffs incorporate the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

87.     In the alternative, to the extent that any of the Defendants are not deemed a fiduciary or co-fiduciary under ERISA, each such Defendant should be enjoined or otherwise subject to equitable relief as a non-fiduciary from further participating in a knowing breach of trust.

88.     To the extent any of the Defendants are not deemed to be fiduciaries and/or are not deemed to be acting as fiduciaries for any and all applicable purposes, any such Defendants are liable for the conduct at issue here, since all Defendants possessed the requisite knowledge and information to avoid the fiduciary breaches at issue here and knowingly participated in

breaches of fiduciary duty by permitting the Plan to offer a menu of imprudent investment options and pay unreasonable recordkeeping and administrative fees, all of which was unjustifiable in light of the size and characteristics of the Plan.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves, the Class and the Plan, demands judgment against Defendants, for the following relief:

(a)    Declaratory and injunctive relief pursuant to Section 502 of ERISA, 29 U.S.C. § 1132, as detailed above;

(b)    Equitable, legal or remedial relief to return all losses to the Plan and/or for restitution and/or damages as set forth above, plus all other equitable or remedial relief as the Court may deem appropriate pursuant to Sections 409 and 502 of ERISA, 29 U.S.C. §§ 1109 and 1132;

(c)    Pre-judgment and post-judgment interest at the maximum permissible rates, whether at law or in equity;

(d)    Attorneys' fees, costs and other recoverable expenses of litigation; and

(e)    Such further and additional relief to which the Plan may be justly entitled and the Court deems appropriate and just under all of the circumstances.

## JURY DEMAND

Plaintiffs demand a jury trial with respect to all claims so triable.

## NOTICE PURSUANT TO ERISA § 502(h)

To ensure compliance with the requirements of ERISA § 502(h), 29 U.S.C. § 1132(h), the undersigned hereby affirms that, on this date, a true and correct copy of this Amended Complaint was served upon the Secretary of Labor and the Secretary of the Treasury by certified mail, return receipt requested.

DATED: April 5, 2022

Respectfully submitted,

/s/ Anthony L. Vitullo
Anthony L. Vitullo
Fee, Smith, Sharp & Vitullo LLP
Three Galleria Tower
13155 Noel Road, Suite 1000
Dallas, Texas 75240
Telephone: (972) 934-9100
Facsimile: (972) 934-9200
Email: lvitullo@feesmith.com

James E. Miller
Laurie Rubinow
Miller Shah LLP
65 Main Street
Chester, CT 06412
Telephone: (866) 540-5505
Facsimile: (866) 300-7367
Email: jemiller@millershah.com
        lrubinow@millershah.com

James C. Shah
Alec J. Berin
Miller Shah LLP
1845 Walnut Street, Suite 806
Philadelphia, PA 19103
Telephone: (866) 540-5505
Facsimile: (866) 300-7367
Email: jcshah@millershah.com
        ajberin@millershah.com

Kolin C. Tang
Miller Shah LLP
19712 MacArthur Blvd.
Irvine, CA 92612
Telephone: (866) 540-5505
Facsimile: (866) 300-7367
Email: kctang@millershah.com

*Attorneys for Plaintiffs, the Plan
and the Proposed Class*