# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| DEBORAH LOCASCIO and DAVID SUMMERS, Individually and as a representatives of a class of similarly situated persons, on behalf of the FLUOR CORPORATION EMPLOYEES' SAVINGS INVESTMENT PLAN,<br><br>*Plaintiffs,*<br><br>v.<br><br>FLUOR CORPORATION, THE FLUOR CORPORATION BENEFITS ADMINISTRATIVE COMMITTEE, THE FLUOR CORPORATION RETIREMENT PLAN INVESTMENT COMMITTEE, and MERCER INVESTMENTS, LLC a/k/a MERCER INVESTMENT MANAGEMENT,<br><br>*Defendants.* | Case No. 3:22-cv-00154-X |

## BRIEF OF *AMICUS CURIAE* CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA IN SUPPORT OF DEFENDANTS' MOTIONS TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

Timothy S. Durst
O'MELVENY & MYERS LLP
2501 North Harwood Street
Suite 1700
Dallas, TX 75201
Tel.: (972) 360-1900
tdurst@omm.com

Paul Lettow
Janet Galeria
U.S. CHAMBER LITIGATION CENTER
1615 H Street, N.W.
Washington, DC 20062

Meaghan VerGow
Deanna M. Rice
Kevin Kraft
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, DC 20006
Tel.: (202) 383-5300
mvergow@omm.com
derice@omm.com
kkraft@omm.com

*Attorneys for Amicus Curiae Chamber of Commerce of the United States of America*

### TABLE OF CONTENTS

**Page**

INTEREST OF *AMICUS CURIAE* ................................................................... 1

INTRODUCTION ............................................................................................... 1

ARGUMENT ....................................................................................................... 4

    I.    ERISA's Prudence Standard Recognizes that Fiduciaries Often Have a
Range of Reasonable Choices Available to Them and Does Not Dictate
Any Particular Approach If Fiduciaries Use a Sound Decision-Making
Process ...................................................................................................... 4

    II.    Plaintiffs' Complaint Reflects Pleading Deficiencies Typical of Recent
ERISA Fiduciary Breach Litigation......................................................... 6

        A.    TDFs Pursue a Range of Strategies to Address the Various Risks
Retirement Investors Face Over Their Lifetimes, and Fiduciaries
Have Discretion to Choose the Approach that Suits Their Plan and
Its Participants ............................................................................. 6

        B.    ERISA Affords Fiduciaries Discretion to Offer a Choice Between
Active and Passive Strategies, and Encouraging Fiduciaries to
Abandon Actively Managed Funds Whenever Their Performance
Dips Below Benchmark Would Harm Participants ................................. 13

    III.    Motions to Dismiss Are an Essential Tool for Weeding Out Meritless
ERISA Claims......................................................................................... 15

CONCLUSION................................................................................................... 17

i

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Anderson v. Intel Corp. Inv. Pol'y Comm.*,
2022 WL 74002 (N.D. Cal. Jan. 8, 2022) .............................................................. 11

*Armstrong v. LaSalle Bank Nat'l Ass'n*,
446 F.3d 728 (7th Cir. 2006) ................................................................................. 5

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544  (2007) ............................................................................................. 16

*Boggs v. Boggs*,
520 U.S. 833 (1997) .............................................................................................. 15

*Bussian v. RJR Nabisco, Inc.*,
223 F.3d 286 (5th Cir. 2000) ....................................................................... 5, 6, 15

*Chao v. Merino*,
452 F.3d 174 (2d Cir. 2006) .................................................................................. 5

*Conkright v. Frommert*,
559 U.S. 506 (2010) .............................................................................................. 17

*Davis v. Wash. Univ. in St. Louis*,
960 F.3d 478 (8th Cir. 2020) ......................................................................... 10, 13

*DiFelice v. U.S. Airways, Inc.*
497 F.3d 410 (4th Cir. 2007) ................................................................................ 8

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005) .............................................................................................. 16

*Fifth Third Bancorp v. Dudenhoeffer*,
573 U.S. 409 (2014) ......................................................................................... 5, 15

*Hecker v. Deere & Co.*,
556 F.3d 575 (7th Cir. 2009) ............................................................................... 11

*Hughes v. Nw. Univ*,
142 S. Ct. 737 (2022) ............................................................................................ 4

*In re Unisys Sav. Plan Litig.*,
74 F.3d 420 (3d Cir. 1996) ................................................................................... 5

*Kirschbaum v. Reliant Energy, Inc.*,
526 F.3d 243 (5th Cir. 2008) ............................................................................... 5

*Kurtz v. Vail Corp.*,
511 F. Supp. 3d 1185 (D. Colo. 2021) ............................................................ 3, 13

*Laborers Nat'l Pension Fund v. N. Trust Quantitative Advisors, Inc.*,
173 F.3d 313 (5th Cir. 1999) ......................................................................... 4, 5, 15

*Lee v. Verizon Commc'ns, Inc.*,
837 F.3d 523 (5th Cir. 2016) ............................................................................... 5

ii

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Loomis v. Exelon Corp.*,
658 F.3d 667 (7th Cir. 2011) ................................................. 13

*Meiners v. Wells Fargo & Co.*,
898 F.3d 820, (8th Cir. 2018) ................................................ 11

*Metro. Life Ins. Co. v. Glenn*,
554 U.S. 105 (2008) ............................................................... 17

*Parmer v. Land O'Lakes, Inc.*,
518 F. Supp. 3d 1293 (D. Minn. 2021) ............................ 10, 11

*Patterson v. Morgan Stanley*,
2019 WL 4934834 (S.D.N.Y. Oct. 7, 2019) .......................... 11

*PBGC ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv.*
*Mgmt. Inc.*,
712 F.3d 705 (2d Cir. 2013) ........................................ 3, 5, 16

*Reetz v. Lowe's Cos.*,
2021 WL 4771535 (W.D.N.C. Oct. 12, 2021) ....................... 11

*Smith v. CommonSpirit Health*,
No. 21-5964 (6th Cir. June 21, 2022) ...................... 11, 13, 14

*Varity Corp. v. Howe*,
516 U.S. 489 (1996) ............................................................... 17

*White v. Chevron Corp.*,
2017 WL 2352137, (N.D. Cal. May 31, 2017) ...................... 14

*Wildman v. Am. Century Servs., LLC*,
362 F. Supp. 3d 685 (W.D. Mo. 2019) ............................ 14, 15

**Statutes**

29 U.S.C. § 1001(b) ...................................................................... 15

29 U.S.C. § 1104(a)(1)(B) ......................................................... 1, 4

**Other Authorities**

Amanda Umpierrez, *Evaluating 'To' vs. 'Through' Glide Paths*,
Plan Sponsor (Feb. 17, 2021) .................................................. 9

Daniel Aronowitz, *Exposing Excessive Fee Litigation Against America's Defined*
*Contribution Plans*, Euclid Specialty (Dec. 2020) ................ 16

Defined Contribution Institutional Investment Association, *The "To vs. Through"*
*Target Date Debate: Is There a Better Way to Frame the Glide Path Discussion?*
(Feb. 1, 2012). ................................................................... 9, 10

DOL EBSA, *Target Date Retirement Funds – Tips for ERISA Plan Fiduciaries*
(Feb. 2013) ....................................................................... 7, 8, 9

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

Jacklyn Wille, *401(k) Fee Suits Flood Courts, Set for Fivefold Jump in 2020*,
Bloomberg Law (Aug. 31, 2020) ................................................................................ 2

Jacklyn Wille, *Spike in 401(k) Lawsuits Scrambles Fiduciary Insurance Market*,
Bloomberg Law (Oct. 18, 2021) .............................................................................. 16

Jon Chambers, *ERISA Litigation in Defined Contribution Plans*,
Sageview Advisory Group (Mar. 2021) ............................................................... 2, 17

Judy Greenwald, *Litigation Leads to Hardening Fiduciary Liability Market*,
Business Insurance (Apr. 30, 2021) ......................................................................... 17

Maciej Kowara and Paul Kaplan, *How Long Can a Good Fund Underperform?*,
Morningstar Advisor Insights (Aug. 17, 2018) ........................................................ 14

Morningstar, *2022 Target-Date Strategy Landscape* (Mar. 23, 2022) ..................... 7, 8, 9, 11, 12

SEC and DOL, Notice of Hearing, Hearing on Target Date Funds and Similar
Investment Options (May 19, 2009) ........................................................................ 8, 9

U.S. Gov't Accountability Off., GAO-11-118, *DEFINED CONTRIBUTION PLANS -
Key Information on Target Date Funds as Default Investments Should Be Provided
to Plan Sponsors and Participants* (Jan. 2011) ....................................................... 9, 10

Vanguard, *Quantifying the Impact of Chasing Fund Performance*
(Apr. 2014) ............................................................................................................... 14

## INTEREST OF *AMICUS CURIAE*

The Chamber of Commerce of the United States of America ("Chamber") is the world's largest business federation, representing approximately 300,000 direct members and indirectly representing the interests of more than three million businesses and professional organizations of every size, in every industry sector, and from every region of the country.[1]  Many of the Chamber's members sponsor or provide services to retirement plans governed by the Employee Retirement Income Security Act of 1974 ("ERISA").  The Chamber regularly participates as *amicus curiae* in ERISA cases at all levels of the federal-court system, including cases addressing the standard for pleading fiduciary-breach claims based on circumstantial allegations of imprudence.  The Chamber submits this brief to aid the Court's consideration of defendants' motions to dismiss by providing additional context regarding the wide range of investment options available to plan fiduciaries, the variety of plan-specific factors that influence fiduciaries' decisions about which investment options to offer, and the broader litigation landscape.

## INTRODUCTION

ERISA provides a safeguard for Americans' retirement savings while encouraging employers to provide retirement benefits to their employees.  As an essential part of this regime, ERISA imposes on fiduciaries a context-driven duty to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  29 U.S.C. § 1104(a)(1)(B).  This standard necessarily recognizes the role of

---

[1] No counsel for a party authored this brief in whole or in part.  No party, no counsel for a party, and no person other than *amicus*, its members, and its counsel made a monetary contribution intended to fund the preparation or submission of this brief.

discretion in fiduciary decision-making and the range of reasonable choices plan fiduciaries generally have available to them.

Despite the flexibility built into the statutory prudence standard, the last several years have brought an explosion of ERISA litigation seeking to second-guess plan fiduciaries' decisions based on alternatives—invariably identified in hindsight—that the fiduciaries allegedly should have selected instead.[2]  Many of these lawsuits question the prudence of particular plan investments with reference to a handful of different options that delivered higher returns over a select period of time, where the contention is the fiduciaries should have seen the higher returns coming.  Others challenge the use of actively managed funds that did not beat their benchmarks over relatively short-term periods, selectively ignoring timeframes in which active management delivered excess returns or protected against downside risk.  These suits typically do not involve any direct allegations of a defective fiduciary process.  Rather, the plaintiffs ask courts to infer from the choices themselves that plan fiduciaries *must* have breached their duties in evaluating the investments.

Permitting such claims to proceed past the pleading stage divorces the prudence standard from its focus on process, effectively turning plan management into a short-term performance contest.  Although allegations of imprudence may be based on circumstantial facts, plaintiffs asserting a breach based on particular investment options must plausibly show that no prudent fiduciary could have made the same choice when the decision was made.  *See, e.g.*, *PBGC ex rel.*

---

[2] *See, e.g.*, *Amicus* App'x Ex. A (Jon Chambers, *ERISA Litigation in Defined Contribution Plans: Background, History, Current Status and Risk Management Techniques*, Sageview Advisory Grp. (Mar. 2021), https://bit.ly/3lIsyPp); *Amicus* App'x Ex. B (Jacklyn Wille, *401(k) Fee Suits Flood Courts, Set for Fivefold Jump in 2020*, Bloomberg Law (Aug. 31, 2020), https://bit.ly/3fDgjQ5).

*St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 720 (2d Cir. 2013) ("*St. Vincent*"); *Kurtz v. Vail Corp.*, 511 F. Supp. 3d 1185, 1200 (D. Colo. 2021).

The complaint in this case exemplifies pleading failures typical of the recent wave of fiduciary-breach litigation.  Plaintiffs are former participants in the Fluor Corporation Employees' Savings Investment Plan (the "Plan") who allege that Plan fiduciaries violated ERISA by imprudently offering the Custom Fluor Target-Date Funds ("Fluor TDFs"), Custom Large Cap Equity Fund, Custom Small/Mid Cap Equity Fund, and Custom Non-U.S. Equity Fund (collectively, the "Custom Asset-Class Funds").  Plaintiffs' claims, like so many others, are not supported by any direct allegations about the process through which the challenged investments were chosen or retained.  With respect to the TDFs, plaintiffs simply hold up a handful of alternative TDF suites that delivered higher returns in hindsight, without any consideration of the many factors and metrics that can reasonably drive fiduciary decision-making.  For the Custom Asset-Class Funds—each of which is actively managed—plaintiffs allege that the Funds' historical returns trailed their benchmarks at three points in time (all within a year and a half of each other) and claim this shows that the Funds had nothing to offer relative to index funds.

Plaintiffs' outcome-oriented critiques draw fiduciaries into litigation for having failed to predict the future.  They rigidly bind fiduciaries to a narrow set of investments preferred by the plaintiffs' bar, depriving fiduciaries of the discretion to consider participant-protective factors other than raw return potential when evaluating investment options.  Worst of all, they demand nearsighted return-chasing at the expense of the long-term performance considerations that are characteristic of prudent decision-making, stripping away the plan-specific context and

discretion that is at the heart of the prudence standard.  Litigation like this does not serve

ERISA's goals; it undermines them.

## ARGUMENT

**I.    ERISA's Prudence Standard Recognizes that Fiduciaries Often Have a Range of Reasonable Choices Available to Them and Does Not Dictate Any Particular Approach If Fiduciaries Use a Sound Decision-Making Process**

As the Supreme Court recently explained, "[a]t times, the circumstances facing an ERISA

fiduciary will implicate difficult tradeoffs," and courts evaluating allegations of imprudence

"must give due regard to the range of reasonable judgments a fiduciary may make based on her

experience and expertise."  *Hughes v. Nw. Univ*, 142 S. Ct. 737, 742 (2022).  Fiduciaries face a

long list of choices when it comes to plan investments.  For instance, fiduciaries must decide

how many investments to offer, and how to structure the plan menu (*e.g.*, whether to organize the

plan's investment options into "tiers" to help guide participants towards the options aligned with

their individual investment approach).  They must decide what strategies to offer, including

whether to offer funds with innovative styles and objectives.  They must consider what balance

of passive and actively managed options to include.  And they must pick specific managers for

each of the strategies in the lineup.  When making these decisions, plan- and participant-specific

considerations are paramount, and such plan-specific judgments necessarily produce varied

results.  There is no one-size-fits-all approach that works for every plan in every circumstance.

ERISA's prudence standard accommodates the complex realities of fiduciary decision-

making.  Instead of attempting to dictate precisely what plan investments and service

arrangements should look like, Congress required only that fiduciaries act prudently when

making plan decisions.  *Laborers Nat'l Pension Fund v. N. Trust Quantitative Advisors, Inc.*, 173

F.3d 313, 317 (5th Cir. 1999).  Because prudence depends on "the character and aim of the

particular plan and decision at issue and the circumstances prevailing at the time," 29 U.S.C.

§ 1104(a)(1)(B), "the appropriate inquiry will necessarily be context specific," *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014).  This standard of prudence recognizes that fiduciary decision-making typically involves the "balancing of competing interests under conditions of uncertainty," *Armstrong v. LaSalle Bank Nat'l Ass'n*, 446 F.3d 728, 733 (7th Cir. 2006), and it does not require fiduciaries to take "any particular course of action if another approach seems preferable," *Chao v. Merino*, 452 F.3d 174, 182 (2d Cir. 2006) (quotation omitted).  In other words, ERISA's "test of prudence is one of conduct, not results." *Kirschbaum v. Reliant Energy, Inc.*, 526 F.3d 243, 253 (5th Cir. 2008).  If fiduciaries arrive at their decisions through prudent consideration of the available options, they may choose whichever approach they "reasonably conclude[] best to promote the interests of [the plan's] participants and beneficiaries." *Lee v. Verizon Commc'ns, Inc.*, 837 F.3d 523, 541 (5th Cir. 2016) (quotation omitted).

By focusing on process rather than results, ERISA recognizes that similarly situated fiduciaries may reach different decisions when faced with the same questions, and the decisions of one fiduciary cannot be condemned solely because another fiduciary in a different plan took a different tack.  Nor are fiduciaries judged by investment results that are the product of unpredictable market fluctuations rather than fundamental, foreseeable flaws in investment strategy.  *See, e.g.*, *St. Vincent*, 712 F.3d at 716; *Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286, 299 (5th Cir. 2000); *In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 434 (3d Cir. 1996).  ERISA does not subject fiduciaries to liability for selecting investments they reasonably judged suitable for their individual plans at the time the decision was made.  *See Bussian*, 223 F.3d at 299; *Laborers Nat'l Pension Fund*, 173 F.3d at 317.

## II.   Plaintiffs' Complaint Reflects Pleading Deficiencies Typical of Recent ERISA Fiduciary Breach Litigation

As exemplified by the present case, recent suits against ERISA plan fiduciaries often follow a familiar pattern in challenging investment options offered to participants.  Plaintiffs, with the benefit of hindsight, identify a handful of alternatives that outperformed the challenged fund and ask courts to infer that plan fiduciaries must have had a flawed decision-making process because they did not choose one of plaintiffs' alternatives.  Or plaintiffs identify windows in which actively managed funds' returns trailed their benchmarks or index funds (often, as in this case, by relatively modest margins) and on that basis ask courts to infer that plan fiduciaries could not have been prudently monitoring the active options.

This common approach leaves virtually no investment, and thus no plan, safe from suit. With countless investment options available in the marketplace, it is nearly certain that plaintiffs will be able to identify better-performing funds in hindsight.  It is likewise all but inevitable— and unexceptional—that an actively managed fund will experience periods of underperformance relative to its benchmark, even if it outperforms over the long-run.  Yet these performance patterns are not knowable before-the-fact, and hindsight performance critiques say nothing about whether the challenged investments were reasonable options to offer.  Claims rooted in post-hoc performance comparisons ignore that ERISA's standard of prudence is "not a test of the result of performance of the investment," but focuses on the process through which fiduciaries arrived at their decisions.  *Bussian*, 223 F.3d at 299.

### A.   TDFs Pursue a Range of Strategies to Address the Various Risks Retirement Investors Face Over Their Lifetimes, and Fiduciaries Have Discretion to Choose the Approach that Suits Their Plan and Its Participants

Plaintiffs' challenge to the Fluor TDFs is exactly the type of results-based attack that does not raise a plausible inference of imprudence.  Their claim is based upon allegations that the

Fluor TDFs delivered lower returns compared to a set of five "off-the-shelf" TDFs selected by plaintiffs in hindsight. *See* Am. Compl. ¶¶ 35-36. These allegations provide no basis to question the reasonableness of the judgment to offer the Fluor TDFs or the Plan fiduciaries' process for selecting and monitoring those funds.

TDFs offer a long-term, all-in-one investment strategy, holding a mix of stocks, bonds, and other investments that automatically changes over time as the participant ages. *See Amicus* App'x Ex. C at 21 (DOL EBSA, *Target Date Retirement Funds – Tips for ERISA Plan Fiduciaries*, at 1 (Feb. 2013), https://bit.ly/3mPRxjC ("*Tips for ERISA Plan Fiduciaries*")). A TDF's initial asset allocation usually consists mostly of equity investments, which typically have greater return potential but also carry greater investment risk. *Id.* As the target retirement date approaches (and often continuing after retirement), the fund's asset allocation shifts to include a higher proportion of more conservative investments. *Id.* TDFs "can be attractive investment options for employees who do not want to actively manage their retirement savings," and many plan sponsors select TDFs as the default investment option for those plan participants who fail to make an election regarding investment of their account balances. *Id.* Largely for these reasons, TDFs have come to dominate the retirement investment landscape, with a record $3.27 trillion in total assets invested in TDF strategies in 2021. *Amicus* App'x Ex. D at 25 (Morningstar, *2022 Target-Date Strategy Landscape*, at 1 (Mar. 23, 2022), https://bit.ly/3HhLXzW ("*Morningstar Target-Date Landscape*")).

With such large amounts of participant assets allocated to them, TDFs provide an attractive target for opportunistic plaintiffs looking to claim massive damages based on asserted underperformance compared to other available options. While hindsight-infected performance critiques are a legally and logically flawed basis for challenging any investment decision, *see,*

*e.g.*, *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 424 (4th Cir. 2007), comparisons to better performing "alternatives" are particularly unilluminating when it comes to TDFs. TDFs do not follow a single strategy for allocating and adjusting risk over the life of the funds, which is decades long and can be expected to cover a variety of market environments, from bull to bear. Rather, TDFs vary significantly in their asset allocation "glide paths," and even funds with the same target date may have materially different asset allocations. *See Amicus* App'x Ex. E at 68–69 (SEC and DOL, Notice of Hearing, Hearing on Target Date Funds and Similar Investment Options, at 1–2 (May 19, 2009), https://bit.ly/3ubDWHR).

One significant difference among TDF glide paths is between funds that use a "to" approach that reaches its most conservative asset allocation at the target retirement date, like the Fluor TDFs, and TDFs that use a "through" approach that continues to reduce the fund's equity exposure after retirement, like plaintiffs' offered alternatives. *See Amicus* App'x Ex. C at 21 (*Tips for ERISA Plan Fiduciaries* at 1); *Amicus* App'x Ex. D at 60 (*Morningstar Target-Date Landscape* at 36); *see also* Mem. of Law in Support of Fluor's Mot. to Dismiss, ECF No. 43, at 16-17 (explaining that the Fluor TDFs use a "to" glide path while plaintiffs' proposed alternatives use a "through" glide path). TDF suites "with a 'through' approach tend to hold more stocks at the retirement date because they expect to continue winding down that exposure in retirement." *Amicus* App'x Ex. D at 61–62 (*Morningstar Target-Date Landscape* at 37-38). Morningstar's analysis found that the average asset allocation for the two types of glide paths differs the most at the target retirement date, when "the average 'through' series holds 46% in stocks versus just 33% for the average 'to' series." *Id.* As Morningstar noted, these difference in asset allocation "can lead to markedly different performance." *Id.* Nonetheless, either approach may be reasonable for a retirement plan, and the choice between them will depend on fiduciary

8

assessments about a particular plan's participant population and their investment behavior, including factors such as participants' average savings rate, overall risk tolerance, and access to other retirement resources like a defined benefit pension plan. *See Amicus* App'x Ex. F (Amanda Umpierrez, *Evaluating 'To' vs. 'Through' Glide Paths*, Plan Sponsor (Feb. 17, 2021), https://bit.ly/3N8CQmK).[3]

Even within the broad "to" and "through" categories, there are significant differences across TDFs in terms of asset allocation and risk profile.[4]  As the U.S. Government Accountability Office has explained: "Differences in the size of the equity component throughout the TDF's glide path may be rooted in different goals and in the treatment of various considerations such as the risk of losing money because of financial market fluctuations— investment risk—and the risk that a participant could outlive his or her assets—longevity risk." *Amicus* App'x Ex. G at 93 (U.S. Gov't Accountability Off., GAO-11-118, *DEFINED CONTRIBUTION PLANS - Key Information on Target Date Funds as Default Investments Should Be Provided to Plan Sponsors and Participants*, at 11 (Jan. 2011), https://bit.ly/3b7HjbP ("GAO Report")).  Just as with the broad "to" versus "through" distinction, these differences in asset allocation strategy "can significantly affect the way a TDF performs."  *Amicus* App'x Ex. C at 21 (*Tips for ERISA Plan Fiduciaries*, at 1).

---

[3] *See also Amicus* App'x Ex. D at 61-62 (*Morningstar Target-Date Landscape* at 36-37) ("It is a common belief that 'to' series are most appropriate for investors who plan to withdraw their money when they enter retirement and 'through' series are best for those who plan to keep their money in the account.").

[4] *See Amicus* App'x Ex. H (Defined Contribution Institutional Inv. Ass'n, *The "To vs. Through" Target Date Debate: Is There a Better Way to Frame the Glide Path Discussion?* (Feb. 1, 2012), https://bit.ly/3NOoPM7); *Amicus* App'x Ex. E at 68–69 (SEC and DOL, Notice of Hearing, Hearing on Target Date Funds and Similar Investment Options, at 1–2 (May 19, 2009), https://bit.ly/3ubDWHR).

TDFs may also invest in actively or passively managed underlying funds—or a mix of both. *See, e.g.*, *Parmer v. Land O'Lakes, Inc.*, 518 F. Supp. 3d 1293, 1306 (D. Minn. 2021). As courts have recognized, active and passive management are different approaches to investing, with "different aims, different risks, and different potential rewards." *Davis v. Wash. Univ. in St. Louis*, 960 F.3d 478, 485 (8th Cir. 2020). Notably, although asset allocation tends to be the primary driver of performance for any TDF—passive, active, or blend—it is essentially the *only* driver of performance for an index-fund-based TDF like the Fluor TDFs, because index funds are designed to closely track (rather than beat) the returns of a relevant market index. *See id.*

Hindsight performance comparisons provide no insight about whether a particular TDF suite's asset allocation strategy was reasonable when plan fiduciaries chose it. While a higher-risk strategy focused on maximizing return potential may make sense for some plans, there are good reasons why fiduciaries might be wary of such an aggressive strategy. Higher-equity TDFs carry an increased risk of poor outcomes for participants in the event of a major market downturn. *See Amicus* App'x Ex. G at 107-08 (GAO Report at 25-26). Many retirement plan investors do not have a large enough financial cushion to comfortably ride out dramatic drops in the value of their retirement assets at or near their retirement date.

Put simply, there is no single solution that represents the "best" TDF strategy for every retirement plan, and choosing among the available options necessarily involves an array of plan-specific considerations beyond simply maximizing raw returns (or minimizing fees). *See Amicus* App'x Ex. G at 110-12 (GAO Report at 28-30); *see also Amicus* App'x Ex. H (Defined Contribution Institutional Inv. Ass'n, *The "To vs. Through" Target Date Debate: Is There a Better Way to Frame the Glide Path Discussion?* (Feb. 1, 2012), https://bit.ly/3NOoPM7). Allegations of imprudence that focus exclusively on performance comparisons ignore the

multifaceted nature of fiduciary decision-making and the wide range of reasonable options available to retirement plan fiduciaries. *See Smith v. CommonSpirit Health*, No. 21-5964, slip op. at 7-8 (6th Cir. June 21, 2022) (explaining that "a showing of imprudence" does not "come down to simply pointing to a fund with better performance"). ERISA affords fiduciaries the flexibility to consider multiple factors when making investment decisions. *See, e.g.*, *Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009) ("[N]othing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund (which might, of course, be plagued by other problems)"); *Reetz v. Lowe's Cos.*, 2021 WL 4771535, at *56 (W.D.N.C. Oct. 12, 2021) ("ERISA does not require fiduciaries to … prioritize raw returns over other considerations, including the higher risk associated with higher expected returns"), *appeal filed*, No. 21-2267 (4th Cir. Nov. 10, 2021). When it comes to TDFs in particular, courts have recognized that plaintiffs cannot state a claim by alleging differences in returns while closing their eyes to readily discernable differences among available TDF strategies. *See Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 822-23 (8th Cir. 2018).[5]

The ease with which plaintiffs can exploit the variation across TDFs to paint a false picture of imprudence is underscored by the fact that the Fluor TDFs "essentially mirror" the BlackRock LifePath Index TDFs, Am. Compl. ¶¶ 30, 36 n.7, which are one of the most popular TDF suites on the market. *See Amicus* App'x Ex. D at 36 (*Morningstar Target-Date Landscape* at 12). Indeed, plaintiffs' counsel themselves cited the Blackrock LifePath Index TDFs as a superior "off-the-shelf" comparator in another recent complaint, noting that the Blackrock funds

---

[5] *See also, e.g.*, *Smith*, slip op. at 7-11; *Anderson v. Intel Corp. Inv. Pol'y Comm.*, 2022 WL 74002, at *10 (N.D. Cal. Jan. 8, 2022); *Parmer*, 518 F. Supp. 3d at 1306–07; *Wehner v. Genentech, Inc.*, 2021 WL 507599, at *9 (N.D. Cal. Feb. 9, 2021); *Patterson v. Morgan Stanley*, 2019 WL 4934834, at *14 (S.D.N.Y. Oct. 7, 2019).

are among the "most popular off-the-shelf target date funds." Am. Compl. ¶¶ 146–50, *Wehner v. Genentech, Inc.*, No. 20-cv-06894-WHO, ECF No. 46 (N.D. Cal. Mar. 2, 2021). The Blackrock TDFs, moreover, have earned a "Gold" Morningstar Analyst Rating—the highest analyst rating Morningstar gives out. *Amicus* App'x Ex. D at 43–44 (*Morningstar Target-Date Landscape* at 19-20).

Plaintiffs in other fiduciary-breach cases have relied on similar performance comparisons to attack other highly rated and widely adopted TDFs from respected investment managers, including the Fidelity Freedom Funds, T. Rowe Price Retirement Funds, and JPMorgan SmartRetirement Funds.[6] The twisted logic of these allegations is evident from the frequency with which TDF offerings held up as prudent alternatives in one case are condemned as unreasonable and imprudent choices in another.[7] This dynamic has made it nearly impossible for fiduciaries to avoid being sued, no matter how careful their process and how reasonable their decisions.

---

[6] *See, e.g.*, Am. Compl., *Davis v. Salesforce.com, Inc.*, No. 3:20-cv-1753-MMC (N.D. Cal. Oct. 23, 2020), ECF No. 38 (challenging JPMorgan SmartRetirement TDFs); Am. Compl., *Boley v. Universal Health Servs., Inc.*, No. 2:20-cv-2644-MAK (E.D. Pa. July 6, 2020), ECF No. 4 (challenging Fidelity Freedom Fund TDFs); Am. Compl., *Tobias v. NVIDIA Corp.*, No. 5:20-cv-6081-LHK (N.D. Cal. Nov. 12, 2021), ECF No. 51 (challenging T. Rowe Price TDFs).

[7] *Compare, e.g.*, Compl. ¶ 93, *Russell v. Ill. Tool Works, Inc.*, No. 1:22-cv-02492 (N.D. Ill. May 11, 2022), ECF No. 1 (identifying Fidelity Freedom Fund TDFs as a prudent investment alternative) *with* Compl. ¶¶ 55, 77-82, *Salvador Aquino v. 99 Cents Only Stores LLC*, No. 2:22-cv-01966-SB-AFM ECF No. 1 (challenging Fidelity Freedom Fund TDFs as imprudent); *and compare* Am. Compl. ¶¶ 54, 56 72, 94, *McGinnes v. FirstGroup Am,, Inc.*, No. 1:18-cv-0326-TSB (S.D. Ohio Sept. 30, 2021), ECF No. 71 (identifying T. Rowe Price TDFs as a prudent investment alternative) *with* Am. Compl. ¶¶ 105-10, *Tobias v. NVIDIA Corp.*, No. 5:20-cv-6081-LHK (N.D. Cal. Nov. 12, 2021), ECF No. 51 (challenging T. Rowe Price TDFs as imprudent).

**B.    ERISA Affords Fiduciaries Discretion to Offer a Choice Between Active and Passive Strategies, and Encouraging Fiduciaries to Abandon Actively Managed Funds Whenever Their Performance Dips Below Benchmark Would Harm Participants**

In attacking the Custom Asset-Class Funds, plaintiffs' complaint, like many others, misses the fundamental point that actively and passively managed strategies reflect different investment approaches with "different aims, different risks, and different potential rewards." *Davis*, 960 F.3d at 485.  Plaintiffs' contention that the Custom Asset-Class Funds were imprudent rests on the theory that these actively managed, multi-manager funds were not worth the cost because they underperformed their benchmarks in some periods and the Plan offered cheaper index fund options.  Am. Compl. ¶¶ 39–46.  Courts, however, have repeatedly affirmed that retirement plan fiduciaries have discretion to offer both index and actively managed funds, giving participants the option to pursue the strategy that aligns with their personal investment goals and risk tolerance.  *See, e.g.*, *Smith*, slip op. at 6-7; *Davis*, 960 F.3d at 485; *Kurtz*, 511 F. Supp. 3d at 1200; *see also Loomis v. Exelon Corp.*, 658 F.3d 667, 673 (7th Cir. 2011) (ERISA encourages "sponsors to allow more choice to participants").

Although plaintiffs here do not expressly frame their Custom Asset-Class Fund claim as a broadside attack on active management, that is what it reduces to in effect.  Actively managed funds offer the potential for above-benchmark returns, but that increased upside potential also comes with the risk that investors could experience returns *below* a relevant benchmark for a period of time.  Even the best-performing actively managed funds—ones that beat their benchmarks over the long run—can be expected to experience periods of below-benchmark returns.  For example, a Morningstar study analyzing the performance of 5,500 actively managed funds over a 15-year period found that the 3,790 funds that outperformed their benchmarks over the full 15-year period nonetheless experienced below-benchmark performance for an average of

9-11 years within that 15-year window. *Amicus* App'x Ex. I (Maciej Kowara and Paul Kaplan, *How Long Can a Good Fund Underperform?*, Morningstar Advisor Insights (Aug. 17, 2018), https://bit.ly/3NXD8xV). As Morningstar observed, "[s]tandard performance evaluation periods—three, five, even 10 years—are far too short to make well-informed judgments about a manager's skill or lack thereof." *Id.* The discretion to offer plan participants a choice between active and passive strategies is meaningless if fiduciaries face charges of imprudence whenever an actively managed fund's returns trail its benchmark and passive counterparts.

Moreover, an excessive focus on relatively short-term returns is counterproductive because it would pressure fiduciaries to reflexively liquidate "underperforming" options. It is widely recognized that "return-chasing"—buying shares after the market has run up in value and selling when the market declines—harms investors. For example, considering a decade of financial data, analysis by Vanguard found that a "buy-and-hold [investment strategy] was superior to a performance-chasing strategy across the board." *Amicus* App'x Ex. J at 163 (Vanguard, *Quantifying the Impact of Chasing Fund Performance*, at 2 (Apr. 2014), https://bit.ly/3zzshpt). Vanguard advised that "[t]o improve the odds of their long-term investment success, investors should understand that some periods of below average performance are inevitable. At such times, investors should remain disciplined in their investment approach and avoid the temptation to chase performance." *Id.* at 165 (Vanguard, *Quantifying the Impact of Chasing Fund Performance*, at 4 (Apr. 2014), https://bit.ly/3zzshpt).

Consistent with Vanguard's findings, courts have recognized that ERISA fiduciaries have discretion to retain investment options through periods of underperformance. *See, e.g.*, *Smith*, slip op. at 8; *Wildman v. Am. Century Servs., LLC*, 362 F. Supp. 3d 685, 707 (W.D. Mo. 2019); *White v. Chevron Corp.*, 2017 WL 2352137, at *20 (N.D. Cal. May 31, 2017), *aff'd*, 752 F.

14

App'x 453 (9th Cir. 2018).  Frequent changes to a plan's investment menu can be disruptive and confusing for participants, and if fiduciaries "adopt a policy of removing funds based on short-term underperformance, Plan participants would be forced to sell their shares at a lower price and miss out on any subsequent improved performance." *Wildman*, 362 F. Supp. 3d at 707.  A long-range investment strategy aligns with the long-term objectives of retirement plan investing and ERISA's essential purpose "to protect ... the interests of participants in employee benefit plans" by ensuring that their savings are available to draw upon in retirement. *Boggs v. Boggs*, 520 U.S. 833, 845 (1997) (quoting 29 U.S.C. § 1001(b)).

### III.   Motions to Dismiss Are an Essential Tool for Weeding Out Meritless ERISA Claims

As the Supreme Court has emphasized, motions to dismiss are an "important mechanism for weeding out meritless claims" in ERISA class actions. *Dudenhoeffer*, 573 U.S. at 425.  A pleading standard under which bare hindsight performance critiques suffice to unlock the doors to discovery does not serve that essential screening function.  With the benefit of hindsight, a plaintiff will virtually always be able to identify a handful of funds that delivered higher returns, or a window in which an actively managed fund's returns dipped below its benchmark.  But, as discussed above, these after-the-fact performance assessments say nothing about the prudence of a plan's fiduciary process or the reasonableness of plan fiduciaries' judgments at the time they were made.  It is impossible to predict which funds will deliver the highest returns in a given period, and fiduciaries must rely on *ex ante* judgments about the funds' risk and potential for return.  Because ERISA does not hinge fiduciary liability on outcomes, plaintiffs do not plausibly allege a fiduciary breach merely by identifying an alternative investment that would have produced higher returns.  *See Bussian*, 223 F.3d at 299; *Laborers Nat'l Pension Fund*, 173 F.3d at 317.

15

The costs of permitting insufficiently founded claims of imprudence to proceed past the pleading stage are substantial.  As the Second Circuit has observed, "the prospect of discovery in a suit claiming breach of fiduciary duty is ominous, potentially exposing the ERISA fiduciary to probing and costly inquiries and document requests."  *St. Vincent*, 712 F.3d at 719; *see also Amicus* App'x Ex. K (Jacklyn Wille, *Spike in 401(k) Lawsuits Scrambles Fiduciary Insurance Market*, Bloomberg Law (Oct. 18, 2021), https://bit.ly/3mTtP65) ("[T]his litigation is very, very expensive.").  "This burden, though sometimes appropriate, elevates the possibility that 'a plaintiff with a largely groundless claim [will] simply take up the time of a number of other people, with the right to do so representing an in terrorem increment of the settlement value, rather than a reasonably founded hope that the discovery process will reveal relevant evidence.'" *St. Vincent*, 712 F.3d at 719 (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005)). Rigorous application of the plausibility standard at the motion to dismiss stage helps ensure that plaintiffs are not permitted to engage in "settlement extortion—using discovery to impose asymmetric costs on defendants in order to force a settlement advantageous to the plaintiff regardless of the merits of his suit."  *Id.* (citations omitted); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007) (acknowledging costs of discovery and explaining "a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed" (citation omitted)).

What is more, the flood of fiduciary-breach litigation in recent years has prompted fiduciary insurers "to raise insurance premiums, increase policyholder deductibles, and restrict exposure with reduced insurance limits."  *Amicus* App'x Ex. L at 178 (Daniel Aronowitz, *Exposing Excessive Fee Litigation Against America's Defined Contribution Plans*, Euclid

16

Specialty, at 4 (Dec. 2020), https://bit.ly/3hNXJaW).[8]  These developments have impaired plan sponsors' ability to shield themselves from the financial impact of litigation.  As plan sponsors increasingly are left to bear a larger share of litigation costs, the risk that litigation will divert financial resources away from providing benefits grows.

In enacting ERISA, Congress sought "to create a system that is [not] so complex that administrative costs, or litigation expenses, unduly discourage employers from offering [ERISA] plans in the first place."  *Conkright v. Frommert*, 559 U.S. 506, 517 (2010) (quoting *Varity Corp. v. Howe*, 516 U.S. 489, 497 (1996)); *see also Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 120 (2008) (Roberts, C.J., concurring in part and concurring in the judgment) (noting importance of "[e]nsuring that reviewing courts respect the discretionary authority conferred on ERISA fiduciaries").  The rise in litigation assailing fiduciaries for selecting anything other than the top-performing fund—as determined in retrospect, over a selected timeframe—is at odds with ERISA's goal of encouraging employers to create and invest in employer-sponsored retirement plans.  *See Conkright*, 559 U.S. at 517.  Allegations that reflect nothing more than fiduciaries' failure to predict inherently unpredictable market movements do not plausibly suggest a flawed process that could support a finding of fiduciary breach.  Plan sponsors and fiduciaries should not be exposed to the substantial burdens of litigation on the merits when non-meritorious allegations are all a plaintiff has to offer.

## CONCLUSION

For the foregoing reasons, *amicus* urges the Court to grant defendants' motions to dismiss.

---

[8] *See also Amicus* App'x Ex. M (Judy Greenwald, *Litigation Leads to Hardening Fiduciary Liability Market*, Business Insurance (Apr. 30, 2021), https://bit.ly/3ytoRBX); *Amicus* App'x Ex. A (Jon Chambers, *ERISA Litigation in Defined Contribution Plans*, Sageview Advisory Group (Mar. 2021), https://bit.ly/2SHZuME).

Dated:  June 21, 2022

Respectfully submitted,

*/s/ Timothy S. Durst*

Paul Lettow
Janet Galeria
U.S. CHAMBER LITIGATION CENTER
1615 H Street, N.W.
Washington, DC 20062

Timothy S. Durst
O'MELVENY & MYERS LLP
2501 North Harwood Street
Suite 1700
Dallas, TX 75201
Tel.: (972) 360-1900
tdurst@omm.com

Meaghan VerGow
Deanna M. Rice
Kevin Kraft
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006
Tel.: (202) 383-5300
mvergow@omm.com
derice@omm.com
kkraft@omm.com

*Attorneys for Amicus Curiae Chamber of Commerce
of the United States of America*

18

**CERTIFICATE OF SERVICE**

I hereby certify that on June 21, 2022, I caused the foregoing to be filed electronically with the Clerk of Court for the U.S. District Court for the Northern District of Texas using the Court's CM/ECF system.  All participants in this case are registered CM/ECF users and will be served by the court's CM/ECF system.

Dated:  June 21, 2022                           _/s/ Timothy S. Durst_____
                                                Timothy S. Durst